## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| SHAWN PETRO, MIKE FAIRCHILD, and DAVID KINCHEN, on behalf of themselves and all others similarly situated, | CASE NO. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| FCA US LLC, | |
| Defendant. | |

Plaintiffs Shawn Petro, Mike Fairchild, and David Kinchen ("Plaintiffs"), on behalf of themselves and all other similarly situated members of the below-defined Nationwide Class and State Classes they respectively seek to represent (collectively, the "Class" or "Class Members"), bring this action against Defendant FCA US LLC ("FCA"), upon personal knowledge as to the factual allegations pertaining to themselves and as to all other matters based upon the investigation made by the undersigned attorneys as well as publicly available information, as follows:

## I.   INTRODUCTION

1.      Plaintiffs bring this action individually and on behalf of a class of similarly situated owners and lessees of Dodge-, RAM-, Jeep-, and Chrysler-branded vehicles equipped with a Gen III 5.7-liter HEMI or 6.4-liter HEMI 392 V-8 engine (together, the "Engines"), model years 2014 to present (collectively, "Class Vehicles"),[1] designed, manufactured, assembled, advertised, and

---

[1]    A partial list of Class Vehicles includes the following models and model year vehicles equipped with a Gen III 5.7-liter HEMI or 6.4-liter HEMI 392 V-8 engine (together, "Engines"): 2014-2016 Chrysler 300; 2014-2016 Dodge Challenger; 2014-2016 Dodge Charger; 2014-2021

distributed by FCA.  The Engines are substantially similar, if not identical, in each of the Class Vehicles.

2.      This is a consumer class action concerning a failure to disclose—or omission of—material facts and a safety concern to consumers.

3.      FCA manufactured, marketed, distributed, and sold the Class Vehicles without disclosing that the valve train system in the Engines were defective in design, workmanship, and/or materials.

4.      The Class Vehicles are equipped with V8 Engines which integrate FCA's proprietary valve train system technology known as Multi-Displacement System ("MDS").  MDS technology is comprised of hardware and software run by the Powertrain Control Module ("PCM") and MDS solenoids, which are specially designed and manufactured to deactivate four (4) of the engine's eight (8) cylinders by using special lifters, solenoids, and pressurized engine oil to activate or deactivate plungers inside four (4) internally collapsible lifters. The below diagram illustrates the MDS's cylinder and lifter setup, i.e. which cylinders are able to be deactivated and which lifters are collapsible.

---

Dodge Durango; 2014-2022 Jeep Grand Cherokee; 2014-2020 RAM 1500; 2014-2022 RAM 2500; and 2014-2022 RAM 3500.



HEMI 5.7 MDS LIFTER DIAGRAM

5.      When the MDS is activated, the lifter tip roller maintains contact with the camshaft; however, the lifter internally collapses allowing the pushrod to travel within the lifter cavity preventing the engine valve from going into the cylinder also known as preventing "valve lift".[2] The MDS's intentional, internal collapse of the lifter results in the pushrod protruding into the lifter which, in turn, results in the intake valve remaining closed at a time the valve would be open in a vehicle without MDS. This, combined with the elimination of spark and fuel to the subject cylinder, results in cylinder deactivation by the MDS.  In short, MDS works by deactivating four (4) of the engine's eight (8) cylinders by command of the PCM when the throttle plate is closed or when the vehicle is maintaining steady speeds at low loads and minimal partial throttle.  The goal of the MDS is to reduce the amount of mechanical energy the engine expends moving air and fuel into the combustion chamber and expelling burnt exhaust gas through the exhaust manifolds and exhaust system, resulting in a modest fuel savings, or to improve the overall fuel consumption of

---

[2]     On non-MDS equipped vehicles, the internal components of the lifter do not allow the pushrod to enter the lifter cavity to prevent valve lift.

the engine without reducing its size.  The below picture illustrates which valves are deactivated in red, while the special lifters involved in the deactivation process are highlighted in blue.



6.      However, the MDS is defective and malfunctions and fails as a result of design, manufacturing, material, and/or workmanship defects (the "Valve Train Defect" or "Defect").

7.      Discovery will show that the Defect is the result of one or more of the following: 1) defects in the design, material, manufacture, or workmanship of the lifters, pushrods, and rocker arms; 2) defects in the design, material, manufacture, or workmanship of the camshaft; 3) FCA's recommended engine oil grades and change intervals are insufficient to keep the MDS, including its lifters and solenoids, functioning as designed and in good working order; 4) FCA's design and specifications for collateral integral components of the MDS do not take into account the stress cylinder deactivation places on these components, resulting in premature failure of lifters, camshafts,  rocker arms, valve springs, and other related components; 5) defects in the design,

material, manufacture, workmanship, and operation of the MDS solenoids and related components which results in the MDS failing during foreseeable uses and duty cycles resulting in catastrophic and costly damage to lifters, camshafts, and critical collateral valve train components which circulate metal debris throughout the engine's lubrication system causing total engine failure; and 6) the ECU/PCM that controls the MDS is not programmed correctly and/or is of inadequate computing speed, leading to mistimed valve train events that damage valve train system components and contribute to the Valve Train Defect.

8.      Modern engines, including the Engines, are designed to last at least 200,000 miles with proper maintenance, while valve train components are designed to last over 100,000 miles. When valve train components begin to fail, including lifters, rocker arms, and valve springs, the vehicle can buck, surge, misfire, idle roughly, make abnormal noises including ticking, knocking, and chirping, and lose power while being driven.  The Defect ultimately causes premature internal wear to the engine and requires premature replacement of valve train components, including the camshafts.  Over time, the internal damage caused by the Defect, including scoring from pieces of the failed valve train components circulating in the engine oil, can damage the cylinders and the engine causing catastrophic engine failure well before the useful life of the engine as elapsed.

9.      Although the Class Vehicles consist of Dodge-, RAM-, Jeep-, and Chrysler-branded vehicles across a number of models and model years, and equipped with two different engines, the Gen III 5.7-liter HEMI and 6.4-liter HEMI 392 engines are based on the same design. In particular, the lifters and other valve train components in each Class Vehicle's Engine are the same. As a result, all the Class Vehicles are uniformly plagued by the identical Defect, which manifests in the Class Vehicles in a substantially similar or identical fashion.

10.     As detailed below, due to the Defect, the Class Vehicles' Engines and component parts experience premature failure at rates and in a manner that do not conform to industry standards.   The Defect substantially decreases the value of the Class Vehicles, forcing owners/lessees of the Vehicles to potentially spend significant money—or hope that FCA will cover the cost—to have the camshaft, lifters, and/or engine replaced.   Even then, replacing the defective parts or engine does not resolve the Defect, because the customer would simply be given another defective part or engine in its place. Further, these repairs are often incomplete—not only are lifters not totally replaced, other engine components that were damaged by the valve train's failure may not be replaced at all.   As a result, the Valve Train Defect will manifest again, often outside the warranty period, and Class Members must then personally bear the cost of replacing lifters, rocker arms, valve springs, and other damaged components.   Further, ongoing damage to the engine by defective components eventually and inevitably leads to Class Vehicles requiring full engine replacement, well before 200,000 miles have elapsed.

11.     FCA has been unable to resolve the Defect.  This may be one of the reasons why FCA recently announced it was discontinuing manufacture of the Engines, which will end with the 2023 model year.  As a result of FCA's inability to permanently repair the Engines, Plaintiffs and Class Members will have to replace valve train components and/or their engines prematurely with similarly defective parts.

12.     FCA has been aware of the Valve Train Defect since 2013 from pre-production testing, design failure mode analysis, calls to its customer service hotline, aggregate part sales, dealer audit, and aggregate warranty information. FCA has also been aware of the Valve Train Defect through consumer complaints made to the National Highway Transportation Safety Administration ("NHTSA")—which FCA monitors—and customer complaints made to FCA and

6

its authorized dealers regarding both prior model years with the same Engines and the Engines in Class Vehicles.  Further, FCA has issued STAR Case Reports, drafted by its internal engineers, to assist dealerships in identifying and replacing damaged valve train components.  These sources of knowledge and information were exclusively in the possession of FCA and its network of authorized dealers and, therefore, unavailable to consumers.

13.     Despite access to aggregate internal data, FCA has actively concealed the existence of the Valve Train Defect by claiming that consumers are responsible for the failures, even when consumers follow FCA's published maintenance schedules.  FCA has also directed dealerships to inform consumers that the strange noises they hear coming from the Engines are normal and that no repairs are needed while the Class Vehicles are under warranty.  FCA has also failed to authorize permanent or complete repairs under warranty.  In this way, FCA has effectively and knowingly transferred the costs of repair to consumers, despite the requirements of its express warranties.

14.     FCA sells the Class Vehicles with a 3-year, 36,000-mile bumper-to-bumper warranty.  However, when Class members bring their Class Vehicles to FCA's authorized dealerships, having already received warranty repair of the Valve Train Defect and requesting coverage for a subsequent failure outside the warranty's durational limits, FCA denies coverage. As a result, Class members are personally exposed to thousands of dollars of out-of-pocket repair costs, including money that flows to FCA when consumers purchase replacement parts through authorized FCA dealerships.

15.     The Valve Train Defect is material because it poses a serious safety concern.  Loss of power while driving, especially at highway speeds, or while trying to merge or change lanes, hesitation, surging, and stalling all significantly increase the risk of vehicle collision.

16.     The Valve Train Defect is also material because the MDS is integral to the proper operation of the Class Vehicle's Engine and it, therefore, significantly impacts driving ability, one of the purposes for which the Class Vehicle was intended.

17.     The Valve Train Defect is further material because consumers incur significant and unexpected repair costs.  FCA's failure to disclose the Defect at the time of purchase is material because no reasonable consumer expects to spend thousands of dollars to repair or replace damaged vehicle components that the manufacturer knows will fail well before the expected useful life of the component and knows will also damage other components or destroy the engine entirely.

18.     As a direct and proximate result of FCA's concealment of, and failure to disclose, the Defect, Plaintiffs and Class members: (1) overpaid for the Class Vehicles at the time of purchase or lease because the Defect significantly diminishes the value of the Class Vehicles; (2) have Class Vehicles that suffer premature Engine and Engine-component failures, rendering them unsafe to drive; and (3) have expended and/or must expend significant money to have the Class Vehicles' Engine components and/or Engine replaced.

19.     The Defect presents a safety risk for Plaintiffs, Class members, and the general public because—as discovery will show—the Defect causes erratic engine behavior, such as bucking and surging, and loss of engine power while driving, increasing the chance that the Class Vehicle will be involved in a collision.

20.     Had FCA disclosed the Valve Train Defect, Plaintiffs and Class members would not have purchased the Class Vehicles or would have paid less for them.

## II.     JURISDICTION

21.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d), because at least one Class member is of diverse citizenship from FCA, there are more than 100

Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000, exclusive of costs and interest.

22.    The Court has personal jurisdiction over FCA because FCA has purposefully availed themselves of the privilege of conducting business activities in the State of Delaware.

### III.    VENUE

23.    Venue is proper in this District, pursuant to 28 U.S.C. §1391, because FCA is deemed to reside in this District, a substantial part of the acts or omissions giving rise to the claims brought herein occurred or emanated within this District, FCA has marketed, advertised, sold, and leased the Class Vehicles in this District, and FCA has caused harm to one or more Plaintiffs residing in this District.

### IV.    PARTIES

**A.    Plaintiffs**

**<u>Plaintiff Shawn Petro</u>**

24.    Plaintiff Shawn Petro is a citizen of Illinois, domiciled in Pekin, Illinois.

25.    On or about August 8, 2020, Plaintiff Petro purchased a new 2020 RAM 2500 equipped with a 6.4L V8 Hemi engine from Sam Leman Chrysler Jeep Dodge Ram ("Sam Leman CJDR"), an authorized FCA dealership located in Morton, Illinois.

26.    Plaintiff Petro purchased his Class Vehicle primarily for personal, family, or household use.

27.    Passenger safety and vehicle reliability were important factors in Plaintiff Petro's decision to purchase his Class Vehicle. Prior to purchasing the vehicle, Plaintiff Petro reviewed marketing materials that touted the quality, safety, and reliability of the vehicle, including television commercials. In addition, Plaintiff researched the vehicle on the manufacturer's website,

written and published by FCA, visited the dealership's website, reviewed the vehicle's window sticker which listed the 6.4L engine as a component, and spoke to the authorized salesperson at the dealership who assured him of the quality, durability, and performance of his Class Vehicle. Plaintiff Petro also took the Class Vehicle for a test ride. Plaintiff Petro selected and ultimately purchased his Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation. The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its engine.

28.     None of the information provided to Plaintiff Petro disclosed any defects in the Class Vehicle or its engine. FCA's omissions were material to Plaintiff Petro, who was acting as a reasonable consumer.

29.     Had FCA disclosed its knowledge of the Valve Train Defect before Plaintiff Petro purchased his vehicle, he would have seen and been aware of the disclosures. Indeed, FCA's misstatements and omissions were material to Plaintiff Petro. Like all members of the Class, Plaintiff Petro would not have purchased his Class Vehicle, or would have paid less for the Class Vehicle, had he known of the Valve Train Defect.

30.     In addition, at the time of Plaintiff Petro's Class Vehicle purchase, and in purchasing his vehicle, he relied upon FCA and its authorized dealerships' representations, which Plaintiff Petro viewed during his online research, including on FCA's website, heard from the salesperson, and reviewed on the window sticker, that the Class Vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively. Plaintiff Petro relied on those representations and the omission of, or failure to disclose, the Valve Train Defect, in

purchasing the Class Vehicle, and absent those representations and omissions, would not have purchased the Class Vehicle, or would have paid less for it.

31.     At the time of his purchase, FCA issued to Plaintiff Petro for his Class Vehicle: (1) a bumper-to-bumper basic warranty lasting for three years or 36,000 miles, whichever occurred first; (2) a powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

32.     At all times during his possession of the Class Vehicle, Plaintiff Petro has properly maintained and serviced his Class Vehicle according to FCA's recommended maintenance guidelines.

33.     In or about March 2021, Plaintiff Petro was driving his Class Vehicle when he heard ticking noises coming from the engine.  At the time, his Class Vehicle had approximately 7,000 miles on the odometer.  He took his Class Vehicle to Sam Leman CJDR for diagnosis and repairs.  In or about April 2021, the dealership assured him that the noise was normal and no repairs were attempted.

34.     On or about December 3, 2021, Plaintiff Petro returned his Class vehicle to Sam Leman CJDR and complained about the loud ticking noise the engine would make soon after he started the Class Vehicle.  He also complained about a knocking noise when the tachometer reached 1700 revolutions per minute and requested repairs.  At the time, his Class Vehicle had 18,961 miles on the odometer.  Again, the dealership told him that the noises were normal, and no repairs were attempted on his Class Vehicle.

35.     Plaintiff Petro made a video recording of his Class Vehicle making the ticking and knocking noises and returned his Class Vehicle to Sam Leman CJDR on December 10, 2021.  He then showed the technician the video and requested repairs.  At the time, his Class Vehicle had

19,191 miles on the odometer.  Ultimately, the dealership replaced all lifters in the engine and returned Plaintiff Petro's Class Vehicle on December 16, 2021.

36.     To date, Plaintiff Petro has not received any notification from FCA about any potential permanent repair, modification, or change to the maintenance schedule which would either repair the Valve Train Defect or prevent the Valve Train Defect from causing damage to his Class Vehicle.  Plaintiff Petro continues to hear ticking noises coming from

37.     Moreover, Plaintiff Petro was informed by Sam Leman CJDR, in or about late December 2021, that the dealership will no longer provide warranty repairs of any kind, per the direction of FCA.  Upon information and belief, FCA seems to have retaliated against Plaintiff Petro as a result of a pre-litigation notice letter sent on his behalf to FCA regarding the Defect.

38.     As a result of the Valve Train Defect, Plaintiff Petro has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Petro will be unable to rely on FCA's advertising or labeling in the future, and so will not purchase or lease another vehicle from FCA in the future, though he would like to do so.

39.     At all times, Plaintiff Petro, like other Class members, has driven his Class Vehicle in a manner that was both foreseeable and in which it was intended to be driven.

**Plaintiff Mike Fairchild**

40.     Plaintiff Mike Fairchild is a citizen of Oklahoma, domiciled in Altus, Oklahoma.

41.     In or around June 2015, Plaintiff Fairchild purchased a new 2015 Dodge RAM 1500 equipped with a 5.7L V8 engine from David Stanley Chrysler Jeep Dodge RAM ("David Stanley CJDR"), an authorized FCA dealer located Midwest City, Oklahoma.

42.     Plaintiff Fairchild purchased his Class Vehicle primarily for personal, family, or household use.

43.     Passenger safety and vehicle reliability were important factors in Plaintiff Fairchild's decision to purchase his Class Vehicle.  Prior to purchasing the Class Vehicle, Plaintiff Fairchild reviewed marketing materials that touted the quality, safety, and reliability of the vehicle, including the vehicle's brochure and television commercials. In addition, Plaintiff researched the vehicle on the manufacturer's website, written and published by FCA, visited the dealership's website, reviewed the Class Vehicle's window sticker which listed the 5.7L engine as a component, and spoke to the authorized salesperson at the dealership who assured him of the quality, durability, and performance of his Class Vehicle.  Plaintiff Fairchild also took the Class Vehicle for a test drive. Plaintiff Fairchild selected and ultimately purchased his Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the Class Vehicle and its components, including its engine.

44.     None of the information provided to Plaintiff Fairchild disclosed any defects in the Class Vehicle or its engine. FCA's omissions were material to Plaintiff Fairchild, who was acting as a reasonable consumer.

45.     Had FCA disclosed its knowledge of the Valve Train Defect before he purchased his Class Vehicle, Plaintiff Fairchild would have seen and been aware of the disclosures. Indeed, FCA's misstatements and omissions were material to Plaintiff Fairchild. Like all members of the Class, Plaintiff Fairchild would not have purchased his Class Vehicle, or would have paid less for the Class Vehicle, had he known of the Valve Train Defect.

46.     In addition, at the time of Plaintiff Fairchild's Class Vehicle purchase, and in purchasing his Class Vehicle, he relied upon FCA and its authorized dealership's representations, which Plaintiff Fairchild viewed in the brochure, heard from the salesperson, and reviewed on the window sticker, that the Class Vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Fairchild relied on those representations and the omission of, or failure to disclose, the Valve Train Defect, in purchasing the Class Vehicle, and absent those representations and omissions, would not have purchased the Class Vehicle, or would have paid less for it.

47.     At the time of his purchase, FCA issued to Plaintiff Fairchild for his Class Vehicle: (1) a bumper-to-bumper basic warranty lasting for three years or 36,000 miles, whichever occurred first; (2) a powertrain warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.

48.     At all times during his possession of the Class Vehicle, Plaintiff Fairchild has properly maintained and serviced his Class Vehicle according to FCA's recommended maintenance guidelines.

49.     In late 2015, when the vehicle had approximately 1,500 miles on the odometer, Plaintiff Fairchild heard ticking noises coming from the engine of his Class Vehicle.  He then took his Class Vehicle to David Stanley CJDR for diagnosis and repair.  He was told, however, that the noises were normal and no repairs of the Defect were attempted.

50.     On two other occasions, including at the 60,000-mile service, Plaintiff Fairchild complained about the ticking noises and requested diagnosis and repair of his Class Vehicle while at the dealership.  Each time, he was told that the noises were normal and no repairs were attempted.

51.     On or about December 13, 2021, the ticking and knocking of the Class Vehicle became louder.  Mr. Fairchild decided that it was time to repair the engine in his Class Vehicle and paid $2,775.51 out of pocket for the repair.

52.     To date, Plaintiff Fairchild has not received any notification from FCA about any potential permanent repair, modification, or change to the maintenance schedule which would either repair the Valve Train Defect or prevent the Valve Train Defect from causing damage to his Class Vehicle.

53.     As a result of the Valve Train Defect, Plaintiff Fairchild has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Fairchild will be unable to rely on FCA's advertising or labeling in the future, and so will not purchase or lease another vehicle from FCA in the future, though he would like to do so.

54.     At all times, Plaintiff Fairchild, like other class members, has attempted to drive his Class Vehicle in a manner that is and was both foreseeable, and in which it was intended to be driven.

**Plaintiff David Kinchen**

55.     Plaintiff David Kinchen is a citizen of Louisiana, domiciled in Slidell, Louisiana.

56.     On or about March 10, 2016, Plaintiff Kinchen purchased a new 2016 RAM 1500 equipped with a 5.7L V8 engine from Salsbury's Dodge City, an authorized FCA dealer located in Baton Rouge, Louisiana.

57.     Plaintiff Kinchen purchased his Class Vehicle primarily for personal, family, or household use.

58.     Passenger safety and vehicle reliability were important factors in Plaintiff Kinchen's decision to purchase his Class Vehicle.  Prior to purchasing the Class Vehicle, Plaintiff Kinchen reviewed the vehicle's brochure, written and published by FCA, visited the dealership's website, reviewed the window sticker which listed the 5.7L V8 engine as a component, and spoke to the authorized salesperson at the dealership who assured him of the quality, durability, and performance of his Class Vehicle.  Plaintiff Kinchen also took the Class Vehicle for a test drive. Plaintiff Kinchen selected and ultimately purchased his Class Vehicle because the vehicle was represented to be, and was marketed as, a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the Class Vehicle and its components, including its engine.

59.     None of the information provided to Plaintiff Kinchen disclosed any defects in the Class Vehicle or its engine. FCA's omissions were material to Plaintiff Kinchen, who was acting as a reasonable consumer.

60.     Had FCA disclosed its knowledge of the Valve Train Defect before he purchased his vehicle, Plaintiff Kinchen would have seen and been aware of the disclosures.  Indeed, FCA's misstatements and omissions were material to Plaintiff Kinchen. Like all members of the Class, Plaintiff Kinchen would not have purchased his Class Vehicle, or would have paid less for the Class Vehicle, had he known of the Valve Train Defect.

61.     In addition, at the time of Plaintiff Kinchen's Class Vehicle purchase, and in purchasing his Class Vehicle, he relied upon FCA and its authorized dealerships' representations, which Plaintiff Kinchen viewed in the brochure, heard from the salesperson, and reviewed on the window sticker, that the Class Vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Kinchen relied on those representations and

the omission of, or failure to disclose, the Valve Train Defect, in purchasing the Class Vehicle, and absent those representations and omissions, would not have purchased the Class Vehicle, or would have paid less for it.

62.     At the time of his purchase, FCA issued to Plaintiff Kinchen for his Class Vehicle: (1) a bumper-to-bumper basic limited warranty lasting for three years or 36,000 miles, whichever occurred first; (2) a powertrain limited warranty lasting for five years or 60,000 miles, whichever occurred first; and (3) an emissions control warranty of eight years or 80,000 miles, whichever occurred first.  In addition, Plaintiff Kinchen purchased an extended warranty.

63.     At all times during his possession of the Class Vehicle, Plaintiff Kinchen has properly maintained and serviced his Class Vehicle according to FCA's recommended maintenance guidelines.

64.     Approximately a day after purchasing his Class Vehicle, Plaintiff Kinchen started the vehicle's engine, and the lifters were tapping. As a result, Plaintiff Kinchen called the service department at Salsbury's Dodge and told them about the issues with his Class Vehicle's lifters. Salsbury's Dodge City told Plaintiff Kinchen that the issues with his lifters were normal, and that Plaintiff Kinchen did not need to make an appointment to bring his Class Vehicle to the dealership for repairs.

65.     On or about August 7, 2017, when his Class Vehicle had approximately 15,252 miles on the odometer, Plaintiff Kinchen took his Class Vehicle to Lakeshore Chrysler-Dodge-Jeep-Kia ("Lakeshore CDJK"), an authorized FCA dealer located in Slidell, Louisiana, because it had been running rough on start-up and exhibiting excessive noise from the engine.  At that time, Plaintiff Kinchen asked Lakeshore CDJK to inspect his Class Vehicle and diagnose the cause of the noises.  He was told by dealership personnel that the reported troubles were not found and no

repairs were attempted.  On or about August 14, 2017, when his Class Vehicle had approximately 15,304 miles on the odometer, Plaintiff Kinchen returned his Class Vehicle to Lakeshore Chrysler-Dodge-Jeep-Kia in Slidell, Louisiana with concerns his Class Vehicle had excessive lifter noise.  The dealership advised that the Class Vehicle was operating as designed.  After the dealership did not attempt repairs, Mr. Kinchen contacted FCA customer service, but was advised that FCA was unable to provide him with any assistance.

66.     On or about September 1, 2017, when his Class Vehicle had approximately 15,494 miles on the odometer, Plaintiff Kinchen took his Class Vehicle in to Salsbury's Dodge City in Baton Rouge, Louisiana for service. During the service, Plaintiff Kinchen asked Salsbury's Dodge City to check the engine tapping. Again, Salsbury's Dodge City told Plaintiff Kinchen that the engine tapping was normal.

67.     To date, Plaintiff Kinchen has not received any notification from FCA about any potential permanent repair, modification, or change to the maintenance schedule which would either repair the Valve Train Defect or prevent the Valve Train Defect from causing damage to his Class Vehicle.

68.     As a result of the Valve Train Defect, Plaintiff Kinchen has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes.  Further, Plaintiff Kinchen will be unable to rely on FCA's advertising or labeling in the future, and so will not purchase or lease another vehicle from FCA in the future, though he would like to do so.

69.     At all times, Plaintiff Kinchen, like other class members, has attempted to drive his Class Vehicle in a manner that is and was both foreseeable, and in which it was intended to be driven.

18

**B. Defendant**

70.    Defendant FCA US LLC is a limited liability company organized and in existence under the laws of the State of Delaware. FCA US LLC's Corporate Headquarters are located at 1000 Chrysler Drive, Auburn Hills, Michigan 48326. FCA designs, manufactures, markets, distributes, services, repairs, sells, and leases passenger vehicles, including the Class Vehicles, nationwide. FCA is the warrantor and distributor of the Class Vehicles in the United States. FCA's sole member is FCA North America Holdings LLC, a Delaware limited liability company, with its principal place of business located at 1000 Chrysler Drive, Auburn Hills, Michigan 48326. FCA North America Holdings LLC's sole member is Fiat Chrysler Automobiles N.V., which was incorporated as a public limited liability company (a "naamloze vennootschap") under the laws of the Netherlands. Its principal office is located at 25 St. James's Street, London SW1A 1HA, United Kingdom.

71.    FCA is a motor vehicle manufacturer and a licensed distributor of new, previously untitled motor vehicles. FCA (like its predecessor, Chrysler) is one of the "Big Three" American automakers (together with Ford and General Motors). FCA engages in commerce by distributing and selling new and unused passenger cars and motor vehicles under the Chrysler, Dodge, Jeep, Ram, Maserati, Alfa Romeo, and Fiat brands. Other major divisions of FCA include Mopar, its automotive parts and accessories division, and SRT, its performance automobile division.

72.    FCA has designed, manufactured, imported, distributed, offered for sale, sold, and leased the Class Vehicles with the knowledge and intent to market, sell, and lease them in all 50 states, including in Michigan. Moreover, FCA and its agents designed, manufactured, marketed, distributed, warranted, sold and leased the Class Vehicles in Michigan and throughout the United States. Dealers act as FCA's agents in selling automobiles under the Chrysler, Dodge, Jeep, Ram,

Maserati, Alfa Romeo, and Fiat brands and disseminating vehicle information provided by FCA, through Fiat Chrysler, to customers.

73.     FCA has a nationwide dealership network and operates offices and facilities throughout the United States.  In order to sell vehicles to the general public, FCA enters into agreements with dealerships who are then authorized to sell the vehicle brands owned by FCA, including Dodge, Jeep, and RAM, to consumers such as Plaintiffs.  In return for the exclusive right to sell new FCA-brand vehicles in a geographic area, authorized dealerships are also permitted to service and repair these vehicles under the warranties FCA provides directly to consumers.  These contracts give FCA a significant amount of control over dealership actions, including vehicle sales and marketing, as well as vehicle parts and accessories.  All service and repairs at an authorized dealership are also completed according to FCA's explicit instructions, issued through service manuals, technical service bulletins ("TSBs"), STAR Case Reports, and other documents.  Per the agreements between FCA and the authorized dealers, consumers such as Plaintiffs can receive services under FCA's issued warranties at dealer locations that are convenient to them.

74.     FCA also develops and disseminates the owners' manuals, warranty booklets, maintenance schedules, advertising such as vehicle brochures, and other promotional materials relating to Class Vehicles through the dealership network.  FCA is also responsible for the production and content of information contained in the Monroney stickers.

75.     FCA warrants the Class Vehicles and is the drafter of those warranties, the terms of which unreasonably favor FCA.  The warranties given by FCA to Plaintiffs and consumers are presented on a "take it or leave it" basis, and Plaintiffs and consumers are not given a meaningful choice in the terms of the warranties provided by FCA.

## V.     FACTUAL ALLEGATIONS

**A.     The Class Vehicles and Their Engines**

76.     The Class Vehicles are all equipped with either the Gen III 5.7-liter HEMI or 6.4-liter HEMI 392 V-8 engine.  These Engines are based on the same design and the camshaft and lifters in each Class Vehicle's Engine are the same.  Discovery will show that the lifters and the MDS in the Engines are substantially similar, if not identical.

77.     The Gen III 5.7-liter HEMI V-8 engine (Figure 1) made its debut in 2003 Dodge Ram pickup trucks and, over the next several years,  became available in numerous FCA vehicle models, including the Class Vehicles at issue herein.



**FIGURE 1**

78.     On June 9, 2004, FCA announced that the 2005 Chrysler 300C, Dodge Magnum RT, and Jeep Grand Cherokee would be the first vehicles with the 5.7 HEMI to have the MDS activated.  As described by Eric Ridenour, Executive Vice President of Product Development, Chrysler Group:

> The Chrysler Group MDS seamlessly alternates between smooth, high fuel economy four-cylinder mode when less power is needed, and V-8 mode when more power from the 5.7L HEMI engine is in demand. This optimizes fuel economy when V-9 power is not needed, without sacrificing vehicle performance – 2005 Chrysler 300C and Dodge Magnum RT owners will get maximum benefits without any compromises.[3]

79.     As explained by Bob Lee, Vice President – Powertrain Product Team, Chrysler Group, "The MDS was part of the engine's original design.  This resulted in a cylinder-deactivation system that is elegantly simple and completely integrated into the engine design. The benefits are fewer parts, maximum reliability and lower cost."[4]

80.     With the MDS, FCA predicted that "customers will experience estimated fuel economy gains of up to 20 percent under various driving conditions, and an expected 10 percent aggregate improvement."[5]

---

[3] *See* https://media.stellantisnorthamerica.com/pdf.do?id=735 (last visited May 3, 2022).
[4] *Id*.
[5] *Id*.

81.     The MDS works specifically by deactivating the valve lifters, highlighted in blue in Figure 2, below, which keeps the valves of four of the cylinders closed, preventing the system from expending energy pulling air into four cylinders and then pushing exhaust fumes out of those cylinders.  The MDS activates in 40 milliseconds (0.040 seconds) and is integrated into the fuel injection system.  The MDS is controlled by the Powertrain Control Module ("PCM"), the computer which coordinates engine and transmission function. During long stretches of road, the MDS will activate and then deactivate every 6 minutes to maintain engine temperature.



**FIGURE 2**

82.     When the MDS is turned on, the PCM commands the solenoids to deactivate "dual mode" or "de-ac" lifters which correspond to cylinders 1, 4, 6, and 7.  The eight de-ac lifters in the Engines are different from the standard lifters because they have both an inner portion of the lifter

and an outer portion of the lifter which can move independently of one another.  When separated, these separate portions of the lifter allow the lifter to move along the surface of the cam lobe without transferring the force from the cam lobe to the plungers, or the portion of the lifter that makes contact with the pushrod.  The end result is that the valves to cylinders 1, 3, 6, and 7 are not opened.  In order to function properly, de-ac lifters are subject to oil pressure of 16 psi when the MDS is engaged.  Figure 3, below, is a picture of a de-ac lifter.



**FIGURE 3**

83.    When the MDS is not engaged, the de-ac lifters behave identically to standard lifters, and are exposed to oil pressure of 3 psi.  Both de-ac and standard lifters are roller lifters, meaning they have a wheel at the bottom of the lifter so that the lifters can roll along the surface of the cam lobe.  Figure 4, below, shows a full set of 16 lifters along with a camshaft from a V8 HEMI engine.



**FIGURE 4**

84.     A major revision to the 5.7-liter HEMI took place in 2009, with the appearance of the Eagle version of the engine.  The Eagle introduced Variable Valve Timing ("VVT") and combined that with the MDS that demanded major changes to the cylinder block, cylinder heads, and other components. The cylinder heads of the engine featured improved intake port flow over the previous generation engine's heads as well as significant changes to combustion chamber size and shape. The addition of the VVT optimized the air flow into and out of the combustion chamber, so that engine was more efficient and could transfer more power to the crankshaft.  The MDS programming was also changed, to increase the RPM range in which the MDS would be triggered to operate.  In advertising, the MDS was re-branded as "Fuel Saver Technology.

85.     The lifters were modified slightly as a result of the change to the Eagle version of the engine.  Specifically, because the modified cams provided a higher lift, both the standard and

de-ac lifters were re-designed.  They are easy to identify because their heads are chamfered, as shown in Figure 5, below.



**FIGURE 5**

86.     The 6.4-liter HEMI 392 engine, named the "Apache," was first introduced by FCA in the 2011 Dodge Challenger SRT8 and then the Dodge Charger SRT8 the following year.  The 6.4-liter HEMI was based on the architecture of the 5.7-liter HEMI V-8 Eagle engine and, like the 5.7-liter HEMI, was built around a 90-degree, cast-iron cylinder block with a deep-skirt design.  In touting the new engine, FCA's press release stated:

> An active intake manifold and high-lift camshaft with cam phasing provides maximum low-end torque while optimizing high-end power…New for 2011 is the Fuel Saver technology in automatic transmission equipped models, which allows the engine to operate economically on four cylinders or use all eight cylinders when needed.[6]

---

[6] *See* https://media.stellantisnorthamerica.com/newsrelease.do?id=10308&mid= (last visited May 3, 2022).

87.     In 2014, a revised version of the 6.4-liter HEMI SRT became available for the Ram 2500 and 3500 pickup trucks.  The 5.7-liter and the 6.4-liter engines share a number of internal components, most importantly the lifters – currently, all versions of the GEN III 5.7-liter HEMI "Eagle" and the GEN III 6.4-liter HEMI "Apache" use the same lifters, sold as sets of four lifters coupled with the yoke in which they fit.  Their MOPAR part numbers are 5038788AD, 5038787AD, 5038786AD, and 5038785AD.

88.     As alleged above, the 5.7-liter HEMI and 6.4-liter HEMI V-8 engines are the same for purposes of this litigation.  In particular, the lifters in the Engines and the basic functioning of the MDS within the Engines are identical.

## B.     The Defect and the Damage It Causes

89.     As discussed above, the Class Vehicles all contain an inherent and uniform defect that results in the Class Vehicles' being highly susceptible to camshaft and/or lifter failures, and ultimately engine failure.

90.     For both the 5.7L and 6.4L HEMI engines, the camshaft within has lobes or "cams," oval-like pieces which are precisely designed and crafted to push on the lifters, which transfer the force of the camshaft's rotation to the valve stems and tell the valves when to open and when to close.  One set of valves lets in the fuel-air mixture and then closes to contain the combustion in the combustion chamber. The other set of valves then opens to let out the resultant exhaust.

91.     The lifters have a roller end which sits on the lobes of the cam, or "rides the cam," and has bearings which allow it to move dynamically.  The lifter body is raised by the action of the cam lobe turning and transfers the force from the cam to the valve stem, resulting in a valve opening or closing.  The cam lobes are computer engineered to have a precise shape so that the valves' opening and closing timing is exactly calibrated for optimum engine performance.

92.     As a camshaft rotates, its egg-shaped lobes push up on lifters (shown at the top and bottom of the image above), which are filled with oil to maintain zero valve lash (*i.e.*, to make sure there is no clearance between parts that should be constantly riding on one another, preventing noise and wear, and allowing for quicker valve opening and closing for improved performance).

93.     On the other side of a hydraulic lifter from the camshaft is a pushrod, which reaches up and presses against a rocker arm that ultimately opens a valve to let air into or out of a cylinder.

94.     Discovery will show that the Defect is the result of one or more of the following: 1) defects in the design, material, manufacture, or workmanship of the lifters, pushrods, and rocker arms; 2) defects in the design, material, manufacture, or workmanship of the camshaft; 3) FCA's recommended engine oil grades and change intervals are insufficient to keep the MDS, including its lifters and solenoids, functioning as designed and in good working order; 4) FCA's design and specifications for collateral integral components of the MDS do not take into account the stress cylinder deactivation places on these components, resulting in premature failure of lifters, camshafts,  rocker arms, valve springs, and other related components; 5) defects in the design, material, manufacture, workmanship, and operation of the MDS solenoids and related components which results in the MDS failing during foreseeable uses and duty cycles resulting in catastrophic and costly damage to lifters, camshafts, and critical collateral valve train components which circulate metal debris throughout the engine's lubrication system causing total engine failure; and 6) the ECU/PCM that controls the MDS is not programmed correctly and/or is of inadequate computing speed, leading to mistimed valve train events that damage valve train system components and contribute to the Valve Train Defect.

95.     Due to the Defect, the lifter fails and is no longer able to actuate the combustion chambers valves with the precision lift, duration or timing needed for efficient combustion, or at

all. As a result, the lifter fails to move up and down correctly causing the lifter roller to periodically lose contact with the camshaft lobe and then slam violently against the face of the camshaft when contact again occurs.  It is important to note that the roller tip of the lifter is guided by the camshaft lobe and is not designed to lose contact with same. As a result of the loss of contact of the lifter and violent impact with the camshaft, the roller on the tip of the lifter eventually fails to roll at all. Instead, the failed lifter is drug across the face of the camshaft lobe when in contact with same destroying the camshaft and sending metal shavings throughout the engine's lubrication system causing substantial damage to bearing surfaces resulting in catastrophic engine failure.   While engine oil lubricates the entire engine, including the camshaft and its lobes, as well as the lifters, the lubrication properties of engine oil are not designed to withstand the immense friction created by a seized roller on the camshaft lobe.  As a result, the spinning camshaft lobes are worn down by the friction of a failed lifter roller dragging across it and/or violently slamming against it causing small pieces of the camshaft lobe to be shaved off, creating a furrow on the cam.  In addition to the shaved pieces of metal circulating within the engine oil, undermining the ability of the oil to properly lubricate the moving pieces of the engine and damaging collateral engine components, the critical camshaft lobe profile (lift and duration) is altered such that the valve lift, duration and timing are affected – specifically, the combustion chamber valves do not open and close as they should.  This results in incomplete or failed engine combustion in the affected cylinders which results in a rough running engine with a dramatic loss of engine power, dramatic loss in fuel economy and leads to further failure of the entire engine system.





96.     In particular, discovery will show that the MDS puts additional stress on both the engine oil needed to lubricate the lifters and on the lifters themselves.  In fact, MDS was designed to provide additional lubrication to standard lifters while the other lifters are deactivated.  However, this additional lubrication is insufficient and then contributes to the Defect.

97.     The Defect causes excessive and premature wear of the camshaft and lifters, which leads to the various pre-failure manifestations of the Defect described above.  As the camshaft and lifters wear against each other, those components begin to deteriorate, and tiny metal shavings are dispersed throughout the Class Vehicle's Engine.  This leads to not only failure of the Engine's camshaft and lifers, but ultimately, failure of the Engine itself as the metal shavings circulate in the engine oil, increasing friction among the moving parts of the engine and even scoring other engine components.  This leads to expensive repairs, with replacement of one set of lifters costing over $2,000, up to full engine replacements, costing around $15,000.

98.     Further, catastrophic engine failure often causes the Class Vehicle to shut off while in motion and renders restart impossible, because the Class Vehicle's Engine and component parts have been completely contaminated with metal shards.  The sudden and unexpected shutoff of the Class Vehicle's Engine while it is in motion (and subsequent inability to restart the Class Vehicle) present an inherent and substantial risk to consumer safety, which Plaintiffs were not aware of prior to purchasing their Class Vehicles.

## C.     FCA's Marketing and Concealment

99.     FCA knowingly designed, manufactured, and sold/leased the Class Vehicles with the Defect, while willfully concealing the true inferior quality, durability, and performance of the Class Vehicles and their Engines.

100.    FCA directly markets the Class Vehicles to consumers via extensive nationwide, multimedia advertising campaigns on television, the Internet, billboards, print publications, mailings, and through other mass media.

101.    FCA touts the qualities of the Engines and markets the Class Vehicles as high-quality, durable, and high-performance vehicles in large part because they are equipped with the Engines, engines which are advertised as providing fuel savings and a seamless transition from the use of eight to four cylinders.

102.    The brochure for the 2013 Jeep Grand Cherokee promises that the 5.7L V8 HEMI engine has "Fuel Saver Technology revamps this eight-cylinder engine during cruising speeds, turning it into a four-cylinder model of efficiency. It can seamlessly alternate between modes, and when you step on the pedal, all eight cylinders quickly roar back to life."[7]

103.    Similarly, the brochure for the 2011 Dodge Challenger promises that 5.7L V8 HEMI engine has "Fuel Saver Technology and VVT [to] give this engine stunning power and efficiency credentials…When equipped with Fuel Saver Technology, the computer uses sophisticated algorithms to seamlessly transition from eight cylinders to four cylinders when full power is not required, providing increased fuel efficiency."[8]

---

[7]  *See* https://cdn.dealereprocess.org/cdn/brochures/jeep/2013-grandcherokee.pdf

[8]  *See* https://cdn.dealereprocess.org/cdn/brochures/dodge/2011-challenger.pdf

104.    The brochure describes the HEMI V8 engines in glowing terms, inviting customers

to upgrade to the more expensive engine:

> **5.7L HEMI® VVT V8 WITH 370 HP, 395 LB-FT OF TORQUE AND UP TO 25 MPG HWY!** The legendary engine releases a big dose of horsepower, impressive torque and a 0 – 60 mph acceleration in the low five-second range. The standard TorqueFlite eight-speed automatic transmission with AutoStick and Fuel Saver Technology helps Charger deliver a whole new level of performance and efficiency. It's technology like this that supplies Charger with an equal dose of muscle and responsibility.

> **6.4L HEMI V8, 485 HP, 475 LB-FT OF TORQUE AND UP TO 25 MPG HWY!** Standard on Charger R/T Scat Pack and SRT® 392, the intensity of this HEMI V8 churns out a potent 485 horsepower and 475 lb-ft of torque across a wide rpm range. Charger SRT accelerates from 0 – 60 mph in the high four-second range and covers a quarter-mile in the high 12-second range. The robust TorqueFlite eight-speed automatic transmission features rev-matching on downshifts.

> **6.2L SRT HELLCAT HEMI V8 WITH 707 HP AND 650 LB-FT OF TORQUE.** This is the baddest of the bunch. It assaults the asphalt with 707 horsepower and an unreal 650 lb-ft of torque. Paired to the class-exclusive[12] TorqueFlite eight-speed, it delivers impressive street driving and maximum performance with 160-millisecond shifts and rev-matching on downshifts. The SRT TorqueFlite eight-speed features enhancements over the standard version to be able to withstand the groundbreaking power, including additional pinion gears and five more clutch pack discs.

105.    The brochure for the 2015 RAM 1500 extolls the virtues of the 5.7L HEMI V8

engine, promising that few engines could "match efficiency and capability," as well as the

following:

> **THE FUEL SAVER AT WORK:** *For years we've been perfecting the Fuel Saver Technology, also known as the Multi-Displacement System (MDS), in the portfolio of HEMI engines. The technology seamlessly shuts off four of the eight cylinders when full power isn't required. During highway cruising, the mighty V8 transforms itself into a fuel-sipping four cylinder.*
>
> **VARIABLE VALVE TIMING (VVT):** *VVT opens and closes the valves with utter precision; engine breathing is optimized, fuel is expended more efficiently and torque increases. Towing and hauling are a breeze.*
>
> **SHORT RUNNER VALVE (SRV):** *Inside the Active Intake Manifold, the SRV controls intake airflow by changing port length based on the rpm; horsepower and torque are enhanced—giving Ram 1500 impressive capability.*

106.    The brochures for the 2020 RAM 2500 touted the "long-proven and capable over the long-run" reliability of the 6.4L HEMI V8 with MDS:[9]

> **THE 6.4L HEMI® V8 WITH VCT AND MDS.** Long-proven and capable over the long run, the 6.4L HEMI V8 credentials start with what counts: best-in-class standard gas horsepower² for impressive towing backed with formidable payload figures. Assets here include Variable Cam Timing (VCT) for consistent power across a wide torque band, Multi-Displacement System (MDS)/Fuel Saver Technology, which delivers 4-cylinder efficiencies during highway cruising, along with the interactive Deceleration Fuel Shut-Off (iDFSO) feature. The 6.4L HEMI V8 is power, performance and efficiency that won't let you down.

107.    The brochures for the 2021 RAM Heavy Duty 2500 and 3500 promise that the 6.4L HEMI V8 with VVT and MDS is "A PROVEN, CAPABLE PERFORMER…Variable Valve Timing (VVT) provides consistent power across a wide torque band, and Multi-Displacement System (MDS)/Fuel Saver Technology delivers 4-cylinder efficiencies during highway cruising."[10]

---

[9]    *See* https://www.auto-brochures.com/makes/ram/Ram_US%20HD_2020.pdf.

[10]   *See* https:// https://digimag.rrd.com/Chrysler/DNL/-2021-Ram-Heavy-Duty-Catalog.pdf?source=null

108.    These statements, which tout the functionality of the Engines with the MDS, conspicuously fail to mention the increased risk of engine failure that the Engines have as a result of the Defect.

109.    This led Plaintiffs and Class members to form a reasonable belief and expectation that the Class Vehicles were durable, high-performance, and of high quality. As a result, the reasonable consumer could not possibly expect that the Class Vehicles would contain a defect that would adversely affect the quality, durability, and performance of the Class Vehicles.

110.    In addition, FCA makes express representations and warranties about the Engines' quality, durability, and performance, as well as the value that it adds to the Class Vehicles, thus making the Engines a selling feature to attract customers.

111.    This led Plaintiffs and Class members to form a reasonable belief and expectation that the Class Vehicles' Engines were durable, high-performance, of high-quality, and positively impact the value of the Class Vehicles, and certainly caused the reasonable consumer not to expect that the Class Vehicles' Engines and component parts were susceptible to failure, and do prematurely fail, and cause other problems that would negatively impact the value of the Class Vehicles.

112.    Not only does FCA make representations regarding the quality of the Class Vehicles and their engines, but it also makes representations regarding the high quality and standard of service and repairs it and its agents make to the Class Vehicles.

113.    In particular, in the warranty booklets provided to Plaintiffs, FCA requires that "[w]arranty service must be done by an authorized Chrysler, Dodge, Jeep or Ram dealer."  FCA in particularly "strongly recommend[s] that you take your vehicle to Selling Dealer. They know you and your vehicle best, and are most concerned that you get prompt and high quality service."

The booklet further states, "[a]uthorized Chrylser, Dodge, Jeep, or Ram dealers will help ensure that all your service needs are met and that you're completely satisfied."

114.    Indeed, FCA is involved in making sure its dealerships have "FCA-trained technicians" to provide such quality repairs.  One FCA subsidiary, FCA Performance Institute a/k/a Stellantis Performance Institute, is involved in recruiting and training technicians to work at dealerships.

115.    Statements like those above led Plaintiffs and Class members to form a reasonable belief and expectation that any repairs to their Class Vehicles would be performed to the highest standard of quality and using materials and/or parts with a similar high standard of quality to ensure their Class Vehicles were adequately repaired, and certainly could not cause the reasonable consumer to expect that repairs performed on their Class Vehicles would involve the use of materials and/or parts of inferior quality that would fail to repair their Vehicles' damage.

116.    Plaintiffs and Class members were exposed to FCA's pervasive, long-term, national multimedia marketing campaign touting the supposed quality, durability, and performance of the Class Vehicles and their Engines, and Class members justifiably made their decisions to purchase/lease their Class Vehicles based on FCA's misleading marketing that concealed and/or omitted the Defect and the many problems it causes.

117.    In reality, as a result of the Defect and the problems it causes, the Class Vehicles are not of the quality, durability, and performance that FCA's marketing represented..

**D.    Applicable Warranties**

118.    FCA sold the Class Vehicles with a "Basic Limited Warranty" ("BLW"), which provides bumper-to-bumper coverage for a period of three years or 36,000 miles, whichever occurs first.

119.    The BLW states:

The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation. There is no list of covered parts since the only exception are tires and headphones. You pay nothing for these repairs. These warranty repairs or adjustments including all parts and labor connected with them will be made by an authorized dealer at no charge, using new or remanufactured parts.

120.    In addition, FCA provides a "Powertrain Limited Warranty ("PLW"), which provides coverage to the Class Vehicles' powertrain components, including the Engine components at issue here, for a period of five years or 60,000 miles, whichever occurs first.

121.    The PLW states:

The Powertrain Limited Warranty covers the cost of all parts and labor needed to repair a powertrain component listed in "section 2.4 E" that is defective in workmanship and materials.

122.    Section 2.4 E, in turn, covers the parts and components of the Class Vehicles' Engines, including:

Cylinder block and all internal parts; cylinder head assemblies; timing case, timing chain, timing belt, gears and sprockets; vibration damper; oil pump; water pump and housing; intake and exhaust manifolds; flywheel with starter ring gear; core plugs; valve covers; oil pan; turbocharger housing and internal parts; turbocharger wastegate actuator; supercharger; serpentine belt tensioner; seals and gaskets for listed components only.

123.    When originally announcing the Gen III HEMI engine and its new MDS, FCA confirmed that both were covered by the powertrain warranty.

124.    To date, FCA has been unable to provide a permanent remedy that actually repairs the Defect, or prevents it from recurring.  Accordingly, irrespective of the applicable model year of any Class Vehicle, or whether it is a new or used vehicle, FCA's representations that it would "[c]over the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation" were

37

materially false to the extent that FCA could not (and did not intend to) repair the Defect as it was obligated to do under the BLW.

125.    Similarly, FCA's representations that it will "cover[] the cost of all parts and labor needed to repair a powertrain component," as obligated under the PLW, are also materially false.

**E.  FCA's Knowledge of the Defect**

126.    FCA fraudulently, intentionally, negligently, and/or recklessly omitted and concealed from Plaintiffs and Class members the Defect in the Class Vehicles even though Defendant knew or should have known of the Defect in Class Vehicles.

127.    Knowledge and information regarding the Defect and the problems it causes were in the exclusive and superior possession of FCA and its dealers, and that information was not provided to Plaintiffs and Class members. Based on pre-production testing, pre-production design failure mode analysis, production design failure mode analysis, early consumer complaints made to FCA and FCA's vast network of exclusive dealers, aggregate warranty data compiled from those dealers, repair orders and parts data received from the dealers, consumer complaints to dealers and NHTSA, and testing performed in response to consumer complaints, *inter alia*, FCA was aware (or should have been aware) of the Defect in the Class Vehicles and fraudulently concealed the Defect and safety risk from Plaintiffs and Class members.

128.    FCA knew, or should have known, that the Defect and the associated safety risk was material to owners and lessees of Class Vehicles and was not known or reasonably discoverable by Plaintiffs and Class members before they purchased or leased Class Vehicles or within the applicable warranty periods.

129.    Notwithstanding FCA's exclusive and superior knowledge of the Defect, FCA failed to disclose the defect to consumers at the time of purchase or lease of the Class Vehicles (or

any time thereafter) and continues to sell Class Vehicles containing the Defect.  FCA intentionally concealed that the Defect presents a safety risk to consumers, including Plaintiffs and members of the Classes, and the public.

**F.    FCA Had Superior Knowledge that the Class Vehicle's Engines Were Defective**

130.    Based on pre-production testing, including failure mode analysis, FCA would have been aware of the Defect well-before any Class member purchased a Class Vehicle.

131.    FCA is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, FCA conducts tests, including pre-sale durability testing, on incoming components, including differentials, to verify the parts are free from defect and align with FCA's specifications.[11]

132.    FCA has robust durability testing for pre-production vehicles. As described by FCA, "powertrains go through a battery of tests meant to ensure customers get maximum performance and durability."[12]  In particular, prior to the debut of the Gen III HEMI with MDS, FCA announced that it had completed "6.5 million customer-equivalent miles through Chrysler Group's development and durability testing."

133.    Vehicles bearing the SRT badge, like some of the Class Vehicles, undergo the standard durability testing as well as additional track evaluations that simulate actual driving conditions.[13]

---

[11]    Akweli    Parker,    *How    Car    Testing    Works*,    HOWSTUFFWORKS.COM, http://auto.howstuffworks.com/car-driving-safety/safety-regulatory-devices/car-testing.htm ("The idea behind car testing is that it allows manufactures to work out all the kinks and potential problems of a model before it goes into full production.").

[12]    https://www.moparmagazine.com/2019/10/put-to-the-test/

[13]    *Id.*

134.    The SRT testing includes a simulated road course or dragstrip, which pushes the engine to peak torque and peak power and tests different types of driveline loads.

**G.     FCA Knew About the Defect from Its Own Service Bulletins and Other Publications Issued to Dealers**

135.    FCA has known of the Defect since at least 2012, via the aggregate parts sales, consumer complaints, and warranty data of earlier models with the Engine.  Further, FCA has issued STAR Case Reports to its authorized dealerships which describe a long history of field reports regarding the Defect.  STAR Case Reports are available through FCA's proprietary systems accessible at authorized dealerships, authored by expert technicians and engineers.

136.    On September 27, 2017, FCA US issued STAR Case Report, No. S1709000010, as a result of the many incidents related to the Defect that had been observed in the field, and as described above, or otherwise reported to FCA by consumers.  Indeed, the document explicitly states that **"[t]his communication documents a record of past experiences" and "captures all previous cases known that appear to be similar or related to the vehicle symptom / condition."** (emphasis added).

137.    The document identified symptoms including, "[c]ustomer complaints may include abnormal engine noise, rough idle, lack of power, misfire.  Upon investigation, it may be found that there is excessive camshaft lobe wear/lifter wear (roller failure) on one or more cam lobes and that camshaft/lifter replacement is necessary."

138.    In addition, the document provided the following Diagnosis: "If excessive camshaft lobe wear/lifter wear (roller failure) has been identified, further inspection should be performed before attempting repair.  Removal of the Oil Control Vale (OCV) for the Variable Valve Timing (VVT) system should be performed to inspect for debris."

139.    The document further provided the following Repair Procedure:

Remove the OCV per the service procedure found in TechCONNECT and inspect the screens for metal debris.  If no debris is found (Pic 1), continue with camshaft and lifter replacement.



If debris is found (Pic 2), engine replacement is required.  Note: Warranty Pre-Authorization requirements may apply.



140.    On January 16, 2021, FCA US issued STAR On-Line Case, Case Number

S1709000010 Rev. A, which, again, identified the following Symptom/Vehicle Issue: "Customer

complaints may include anormal engine noise, rough idle, lack of power, misfire.   Upon

investigation, it may be found that there is excessive camshaft lobe wear/lifter wear (Roller failure) on one or more cam lobes and that camshaft/lifter replacement is necessary."

141. The publication also identified the same diagnosis and provided for the same repair procedures as the previous publication it replaced that was issued more than three years prior.

142. FCA have known of the Defect since at least 2012, as indicated by the numerous service bulletins and STAR On-Line cases and other publications that have been issued since that time and continue to be issued to this day.

## H. FCA Knew About the Defect Based on the Volume of Complaints filed with NHTSA

143. Federal law requires automakers like FCA to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. See TREAD Act, Pub. L. No. 106-414, 114 Stat.1800 (2000).

144. Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id*. Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety-related. *Id*. Thus, FCA knew or should have known of the many complaints about the Defect logged by NHTSA ODI. The content, consistency, and disproportionate number of those complaints alerted, or should have alerted, FCA to the Defect in the Class Vehicles as early as 2011.

145. Exhibit A, attached to this Complaint, contains a representative sampling of the many complaints concerning the Defect which are available through NHTSA's website,

www.NHTSA.gov.  Many of the complaints reveal that FCA, through its network of dealers and repair technicians, had been made aware of the Defect. In addition, the complaints indicate that despite having knowledge of the Defect and even armed with knowledge of the exact vehicles affected, FCA often refused to diagnose the defect or otherwise attempt to repair it while Class Vehicles were still under warranty.

**I.      Defendant Knew About the Defect Through, and as Reflected by, Online Complaints**

146.    Consumers have also posted extensively on websites dedicated to discussions of FCA vehicles regarding the defect in vehicles equipped with the Engines. FCA has made the monitoring of consumer complaints as posted on third-party websites a part of their brand and reputational management for at least a decade.[14]

147.    Numerous owners and lessees of Class Vehicles have posted about their experiences with the Defect in the Class Vehicles on internet forums created for the discussion of particular vehicle models.  These complaints, detailing both the failures and the responses of FCA and FCA's authorized dealerships, demonstrate FCA was on notice of the Defect.  Exhibit B, attached to the Complaint, are examples of such online complaints concerning the Defect, and customers' contact with FCA about the Defect, posted to such online forums.

**J.      The Agency Relationship Between FCA US, LLC and its Network of Authorized Dealerships**

148.    In order to sell vehicles to the general public, Defendant enters into agreements with its nationwide network of authorized dealerships to engage in retail sales with consumers such as Plaintiffs. In return for the exclusive right to sell new, Defendant-branded vehicles, the

---

[14]   Read, Richard, "Taking your car complaint online? Chrysler, GM, and Ford will see it.", *Christian Science Monitor*, Aug. 21, 2012 (available at https://www.csmonitor.com/Business/In-Gear/2012/0827/Taking-your-car-complaint-online-Chrysler-GM-and-Ford-will-see-it.      (last visited December 10, 2021).

authorized dealerships are also permitted under these agreements with Defendant to service and repair these vehicles under the warranties Defendant provides directly to consumers who purchased new vehicles from the authorized dealerships. Accordingly, Defendant's authorized dealerships are Defendant's agents, and the consumers who purchase or lease Defendant vehicles are the third-party beneficiaries of these dealership agreements, which allow the consumers to purchase and service their Defendant vehicles locally. Because Plaintiffs and members of the Class there are third-party beneficiaries of the dealership agreements which create the implied warranty, they may avail themselves of the implied warranty. This is true because third-party beneficiaries to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied warranty. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1185 (C.D. Cal. 2010).

149.    Further, Plaintiffs and each of the members of the Class are the intended beneficiaries of Defendant's express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by Defendant. Defendant's warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of Defendant's express and implied warranties, and consumers, including Plaintiff and Class Members, may therefore avail themselves of those warranties.

150.    Defendant issued the express warranty to Plaintiffs and the Class members. Defendant also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. Defendant also is responsible for the content of the Moroney stickers on Defendant-branded vehicles. Because

Defendant issues the express warranty directly to the consumers, the consumers are in direct privity with Defendant with respect to the warranties.

151.   In promoting, selling, and repairing its defective vehicles, Defendant acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive Defendant representatives and agents. That the dealers act as Defendant's agents is demonstrated by the following facts:

(a)   The authorized FCA US LLC dealerships complete all service and repair according to Defendant's instructions, which Defendant issues to its authorized dealerships through service manuals, TSBs, and other documents, often only accessible via Defendant's proprietary computer systems;

(b)   Consumers are able to receive services under Defendant's issued New Vehicle Limited Warranty only at Defendant's authorized dealerships, and they are able to receive these services because of the agreements between Defendant and the authorized dealers. These agreements provide Defendant with a significant amount of control over the actions of the authorized dealerships;

(c)   The warranties provided by Defendant for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

(d)   Defendant dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers;

(e)   Defendant controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, and the dealerships are able to perform repairs under warranty only with Defendant's authorization;

(f)     Defendant has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public; and

(g)     Defendant implemented its express and implied warranties as they relate to the defects alleged herein by instructing authorized Defendant dealerships to address complaints of the Defect by prescribing and implementing the relevant Star Case reports cited herein.

152.   Indeed, FCA's warranty booklets make it abundantly clear that FCA's authorized dealerships are FCA's agents for vehicle sales, service, and to receive repairs from FCA under the warranties it provides directly to consumers such as Plaintiffs. The booklets, which are plainly written for the consumers, not the dealerships, tell the consumers repeatedly to seek repairs and assistance at its "your dealer." For example, at the outset, FCA notifies Plaintiffs and class members in the warranty booklet that "warranty repairs or adjustments – including all parts and labor connected with them – will be made by your dealer." Further, the booklets state, "[w]arranty service must be done by an authorized Chrysler, Dodge, Jeep, or Ram dealer." The booklets direct Plaintiffs and class members, should they have warranty problems, to first "talk to your dealer's service manager or sales manager first." Next, Plaintiffs and class members are directed, "if you're not satisfied with your dealer's response to your problem, FCA US recommends that you…[d]iscuss your problems with owner or general manager of the dealership…If your dealership still can't resolve the problem, contact the FCA US Customer Assistance Center" where "a FCA US representative at FCA US headquarters will review you situation."

153.   The warranty booklet further states, "Authorized Chrysler, Dodge, Jeep or Ram dealers will help ensure that all your service needs are met and that you're completely satisfied."

154.    Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of Defendant. Plaintiffs and each of the members of the Class have had sufficient direct dealings with either Defendant or its agent dealerships to establish privity of contract between Defendant, on one hand, and Plaintiffs and each of the members of the Class, on the other hand. This establishes privity with respect to the express and implied warranty between Plaintiffs and Defendant.

**K.    Fraudulent Concealment Allegations**

155.    Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at FCA responsible for disseminating false and misleading marketing materials and information regarding the Class Vehicles.  FCA necessarily is in possession of, or has access to, all of this information.

156.    Plaintiffs' claims arise out of FCA's fraudulent concealment of the Defect and the problems it causes, and its representations about the quality, durability, and performance of the Class Vehicles, including their Engines.

157.    To the extent that Plaintiffs' claims arise from FCA's fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiffs base their claims.  Plaintiffs allege that at all relevant times, including specifically at the time they purchased or leased their Class Vehicles, FCA knew, or was reckless in not knowing, of the Defect; FCA was under a duty to disclose the Defect based upon its exclusive knowledge of it, its affirmative representations about it, and its concealment of it, and FCA never disclosed the Defect to Plaintiffs or the public at any time or place or in any manner.

158.    Plaintiffs make the following specific fraud allegations with as much specificity as possible, although they do not have access to information necessarily available only to FCA:

(a)     ***Who***: FCA actively concealed the Defect from Plaintiffs and Class members while simultaneously touting the quality, durability and performance of the Class Vehicles and their Engines.  Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals at FCA responsible for such decisions.

(b)     ***What***: FCA knew, or was reckless or negligent in not knowing, that the Class Vehicles contain the Defect.  FCA concealed the Defect and made contrary representations about the quality, durability, performance, and other attributes of the Class Vehicles.

(c)     ***When***: FCA concealed material information regarding the Defect at all times and made representations about the quality, durability, and performance of the Class Vehicles, starting no later than 2013, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale/lease, and on an ongoing basis, and continuing to this day.  FCA has not disclosed the truth about the Defect in the Class Vehicles to anyone outside of FCA.  FCA has never taken any action to inform consumers about the true nature of the Defect in Class Vehicles.  And when consumers brought their Class Vehicles to FCA complaining of the symptoms associated with the Defect, FCA denied any knowledge of, or responsibility for, the Defect.

(d)     ***Where***:  FCA concealed material information regarding the true nature of the Defect in every communication it had with Plaintiffs and Class members and made contrary representations about the quality, durability, and performance of the Class Vehicles ad their Engines.  Plaintiffs are aware of no document, communication, or other place or thing in which FCA disclosed the truth about the Defect in the Class Vehicles to anyone outside of FCA.  Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manual, or on FCA's website.

(e)      **How**: FCA concealed the Defect from Plaintiffs and Class members and made representations about the quality and durability of the Class Vehicles.  FCA actively concealed the truth about the existence and nature of the Defect from Plaintiffs and Class members at all times, even though it knew about the Defect and knew that information about the Defect would be important to a reasonable consumer, and FCA promised in its marketing materials that the Class Vehicles have qualities that they do not have, and moreover, made representations in its warranties that it knew were false, misleading, and deceptive.

(f)      **Why**: FCA actively concealed material information about the Defect in Class Vehicles, and simultaneously made representations about the quality, durability, and performance of the Class Vehicles and their Engines, for the purpose of inducing Plaintiffs and Class members to purchase or lease the Class Vehicles, rather than purchasing or leasing competitors' vehicles.  Had FCA disclosed the truth, for example, in its advertisements or other materials or communications, Plaintiffs (and reasonable consumers) would have been aware of the Defect, and would not have bought the Class Vehicles or would have paid less for them.

## VI.      TOLLING OF THE STATUTE OF LIMITATIONS

### A.      Fraudulent Concealment

159.      FCA has known of the Defect in the Class Vehicles since at least 2012, and has concealed from, or failed to disclose to,  Plaintiffs, Class members, and the public the full and complete nature of the Defect, even when directly asked about it by Plaintiffs and Class members during communications with FCA, FCA Customer Assistance, FCA dealerships, and FCA service centers.  FCA continues to conceal, and fail to disclose, the Defect to this day.

160.      Any applicable statute of limitation has been tolled by FCA's knowledge, failure to disclose, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

**B.      Estoppel**

161.     FCA was, and is, under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles.  FCA actively concealed – and continues to conceal – the true character, quality, and nature of the Class Vehicles and knowingly made representations about the quality and durability of the Vehicles.  Plaintiffs and Class members reasonably relied upon FCA's knowing and affirmative representations and/or active concealment of these facts.  Based on the foregoing, FCA is estopped from relying on any statutes of limitation in defense of this action.

**C.      Discovery Rule**

162.     The causes of action alleged herein did not accrue until Plaintiffs and Class members discovered that their Class Vehicles contained the Defect.

163.     However, Plaintiffs and Class members had no realistic ability to discern that the Class Vehicles were defective until—at the earliest—after the Defect caused their Engines and/or component parts failed.

164.     Even then, Plaintiffs and Class members had no reason to know that such failures, or the pre-failure symptoms described above, were caused by a defect in the Class Vehicles because of FCA's active concealment of the Defect.  Not only did FCA fail to notify Plaintiffs or Class members about the Defect, FCA, in fact, denied any knowledge of, or responsibility for, the Defect when directly asked about it.

165.     Thus, Plaintiffs and Class members were not reasonably able to discover the Defect until after they had purchased or leased the Class Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until, at earliest, they discovered that the Defect was causing camshaft lobe and/or lifter failure in the Engines of their Class Vehicles.

## VII.   CLASS ALLEGATIONS

166.   Plaintiffs bring this action pursuant to Rule 23(a) and (b)(2)-(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated as members of the following Nationwide Class and State Classes defined as:

**Nationwide Class**:

All persons or entities in the United States (including its territories and the District of Columbia) that purchased or leased a Class Vehicle.  Class Vehicles consist of all Dodge-, RAM-, Jeep-, and Chrysler-branded vehicles, model years 2014 to present, equipped with a Gen III 5.7-liter HEMI or 6.4-liter HEMI 392 engine.

**Illinois Class**:

All persons or entities that purchased or leased a Class Vehicle within Illinois or that purchased or leased a Class Vehicle and reside in Illinois.

**Louisiana Class**:

All persons or entities that purchased or leased a Class Vehicle within Louisiana or that purchased or leased a Class Vehicle and reside in Louisiana.

**Oklahoma Class**:

All persons or entities that purchased or leased a Class Vehicle within Oklahoma or that purchased or leased a Class Vehicle and reside in Oklahoma.

167.   Excluded from the Class are Defendant; their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates of Defendants; Defendants' dealers; Class Counsel and their employees; the judicial officers and their immediate family members and associated court staff assigned to this case; and all persons within the third degree of relationship to any such persons.

168.   Certification of Plaintiffs' claims for Class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a Class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

169.    This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Fed. R. Civ. P. 23.

170.    **Numerosity**.  Rule 23(a)(1) of the Federal Rules of Civil Procedure:  The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  While Plaintiffs are informed and believe that there are at least thousands of members of the Class, the precise number of Class members is unknown to Plaintiffs but may be ascertained from FCA's books and records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

171.    **Commonality and Predominance**.  Rules 23(a)(2) and (b)(3) of the Federal Rules of Civil Procedure:  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, but not limited to:

(a)    whether FCA engaged in the conduct alleged herein;

(b)    whether FCA designed, manufactured, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

(c)    whether FCA designed, manufactured, marketed, and distributed Class Vehicles with an Defect;

(d)    whether Plaintiffs and Class members overpaid for their Class Vehicles and/or did not receive the benefit of the bargain;

(e)    whether Plaintiffs and Class members are entitled to damages and other monetary relief and, if so, in what amount;

(f)      whether FCA's alleged conduct constitutes the use or employment of an unconscionable commercial practice, deception, fraud, false pretense, false promise, and misrepresentation within the meaning of the applicable state consumer fraud statutes;

(g)      whether FCA has been unjustly enriched under applicable state laws;

(h)      whether FCA has violated its express warranties to Plaintiffs and Class members;

(i)      whether FCA actively concealed the Defect in order to maximize profits to the detriment of Plaintiffs and Class members; and

(j)      such other common factual and legal issues as are apparent from the allegations and causes of action asserted in this Complaint.

172.    **Typicality**.  Rule 23(a)(3) of the Federal Rules of Civil Procedure:  Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through FCA's wrongful conduct as described above.  All claims seek recovery on the same legal theories and are based upon FCA's common course of conduct.

173.    **Adequacy**.  Rule 23(a)(4) of the Federal Rules of Civil Procedure:  Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously.  The Class' interests will be fairly and adequately protected by Plaintiffs and their counsel.

174.   **Declaratory Relief**.  Rule 23(b)(2) of the Federal Rules of Civil Procedure:  FCA has acted or refused to act on grounds generally applicable to Plaintiffs and Class members, thereby making appropriate declaratory relief, with respect to each Class as a whole.

175.   **Superiority**.  Rule 23(b)(3) of the Federal Rules of Civil Procedure:  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against FCA, so it would be impracticable for Class members to individually seek redress for FCA's wrongful conduct.  Even if Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.   CLAIMS

**A.     Claims Brought on Behalf of the Nationwide Class**

### COUNT I
**Fraudulent Concealment**
**(On behalf of the Nationwide Class, or alternatively, all Sub-Classes)**

176.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 165 above as if fully set forth herein.

177.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Class under the common law of fraudulent concealment, which is materially uniform in all states.  In the alternative, Plaintiffs bring this claim on behalf of each State Class under the law of each state in which Plaintiffs and Class members purchased or leased the Class Vehicles.

178.    FCA fraudulently concealed and suppressed material facts concerning the quality of the Class Vehicles and their Engines, as well as the existence of the Defect.

179.    Despite advertising the Class Vehicles as durable, high-performance, and being of high quality, FCA knew when it manufactured, marketed, and sold or leased the Class Vehicles that their Engines suffered from a design and/or manufacturing defect that reduced the Class Vehicles' value and subjected the Engine's camshaft and lifters to premature and excessive wear that causes those Engine components, as well as the Engine itself, to fail.

180.    FCA failed to disclose these facts to consumers at the time it manufactured, marketed, and sold or leased the Class Vehicles and FCA knowingly and intentionally engaged in this concealment in order to boost sales and revenue, maintain its competitive edge in the automobile market, and obtain windfall profit.  Through its active concealment and/or suppression of these material facts, FCA sought to increase consumer confidence in the Class Vehicles, and to falsely assure purchasers and lessors of the same that the Class Vehicles were of sound quality and that FCA was a reputable manufacturer that stands behind the automobiles it manufactures.  FCA engaged in this behavior to protect its profits, avoid warranty replacements, avoid recalls that would impair the brand's image, cost it money, and undermine its competitiveness in the automobile industry.

181.    Plaintiffs and Class members were unaware, and could not reasonably discover on their own, that FCA's representations were false and misleading, or that it had omitted material facts relating to the Class Vehicles.

182.    FCA had a duty to disclose, rather than conceal and suppress, the full scope and extent of the Defect because:

(a)     FCA had exclusive or far superior knowledge of the Defect and concealment thereof;

(b)     the facts regarding the Defect and concealment thereof were known and/or accessible only to FCA;

(c)     FCA knew that Plaintiffs and Class members did not know about, or could not reasonably discover, the Defect and concealment thereof; and FCA made representations and assurances about the qualities of the Class Vehicles and their Engines, and about the existence of a repair for the Defect, that were misleading, deceptive, and incomplete without the disclosure of the fact that the Class Vehicles' Engines suffered from a systemic design and/or manufacturing defect.

183.    These omitted and concealed facts were material because a reasonable consumer would rely on them in deciding to purchase or lease the Class Vehicles, and because they substantially reduced the value of the Class Vehicles purchased or leased by Plaintiffs and Class members.  Whether the Class Vehicles were defective, of sound quality, and durable, and whether FCA stood behind the Class Vehicles, would have been an important factor in Plaintiffs' and the Class members' decisions to purchase or lease the Class Vehicles.  Plaintiffs and Class members trusted FCA not to sell them vehicles that were defective and significantly overpriced.

184.    FCA intentionally and actively concealed and suppressed these material facts to falsely assure consumers that their Class Vehicles were free from known defects, as represented by FCA and reasonably expected by consumers.

185.    Plaintiffs and Class members were unaware of these omitted material facts and would have paid less for the Class Vehicles, or would not have purchased/leased them at all, if they had known of the concealed and suppressed facts.  Plaintiffs and Class members did not

receive the benefit of their bargain due to FCA's fraudulent concealment.  Plaintiffs' and Class members' actions in purchasing the Class Vehicles were justified.  FCA was in exclusive control of the material facts, and such facts were not known or reasonably knowable to the public, Plaintiffs, or Class members.

186.    Plaintiffs and Class members relied to their detriment upon FCA's reputation, fraudulent misrepresentations, and material omissions regarding the quality, durability, and high performance of the Class Vehicles and their Engines.

187.    As a direct and proximate result of FCA's deceit and fraudulent concealment, including its intentional suppression of true facts, Plaintiffs and Class members suffered injury. They purchased and leased Class Vehicles that had a diminished value by reason of FCA's concealment of, and failure to disclose, the Defect.  Plaintiffs and Class members also paid substantial money to (unsuccessfully) repair the Defect.

188.    Accordingly, FCA is liable to the Nationwide Class and/or State Classes for their damages in an amount to be proven at trial.

189.    On information and belief, FCA has still not made full and adequate disclosure and continues to defraud Plaintiffs and Class members.  FCA also continues to conceal material information regarding the Defect.

190.    FCA's acts were done deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class members' rights.  FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT II**
**Unjust Enrichment**
**(On behalf of the Nationwide Class, or alternatively, all Sub-Classes)**

191.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 165 above as if fully set forth herein.

192.    Plaintiffs bring this cause of action on behalf of themselves and the Nationwide Class under the common law of unjust enrichment, which is materially uniform in all states.  In the alternative, Plaintiffs bring this claim on behalf of each State Class under the law of each state in which Plaintiffs and Class members purchased or leased Class Vehicles.

193.    Plaintiffs bring this claim as an alternative to the contractual warranty claims asserted below and in the event that Plaintiffs prevail on their claims that any contract with FCA (including any express warranty) was fraudulently induced and/or Plaintiffs prevail in proving that the warranties cannot be enforced by FCA due to FCA having provided the warranties only after entering into a contract with a purchaser or lessor, or due to FCA's intentional and deceptive efforts to conceal the Defect and avoid its warranty obligations.

194.    FCA has received and continues to receive millions in revenue from the sale of the Class Vehicles since 2013.

195.    This revenue was a benefit conferred upon FCA by Plaintiffs and Class members, individuals living across the United States.

196.    FCA manufactured, marketed, and sold defective Class Vehicles to Plaintiffs and Class members, while actively concealing the Class Vehicles' known defects and touting their quality, durability, and high-performance.

197.    FCA benefitted from selling defective cars for more money than they were worth, at a profit, and Plaintiffs have overpaid for the cars and, in some instances, been forced to pay to (unsuccessfully) repair the Defect.

198.    Plaintiffs and Class members elected to purchase or lease the Class Vehicles based on FCA's misrepresentations, deception, and omissions.  FCA knew and understood that it would (and did) receive a financial benefit, and voluntarily accepted the same, from Plaintiffs and Class members when they elected to purchase or lease the Class Vehicles.

199.    The Class Vehicles' Defect, and FCA's concealment of the same, enriched FCA beyond its legal rights by securing through deceit and falsehood millions of dollars in revenues since 2013 and continues to do so today.

200.    Therefore, because FCA will be unjustly enriched if it is allowed to retain the revenues obtained through falsehoods, deception, and misrepresentations, Plaintiffs and each Class member are entitled to recover the amount by which FCA was unjustly enriched at his or her expense.

201.    Accordingly, Plaintiffs, on behalf of themselves and each Class member, seek damages against FCA in the amounts by which it has been unjustly enriched at Plaintiffs' and each Class member's expense, and such other relief as this Court deems just and proper.

## COUNT III
### Violation of the Magnuson-Moss Warranty Act
### (15 U.S.C. § 2301, *et seq.*)
### (On behalf of the Nationwide Class, or alternatively, all Sub-Classes, or by Plaintiffs for themselves individually)

202.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 165 above as if fully set forth herein.

203.    This Court has jurisdiction to decide claims brought under the Magnuson-Moss Warranty Act, 15 U.S.C. §2301, *et seq.* ("MMWA") by virtue of 28 U.S.C. §1332(a)-(d).

204.    The Class Vehicles are "consumer products" within the meaning of the MMWA, 15 U.S.C. §2301(1).

205.    Plaintiffs are "consumers" within the meaning of the MMWA, 15 U.S.C. §2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its written warranties.

206.    FCA is a "supplier" and "warrantor" within the meaning of the MMWA, 15 U.S.C. §2301(4)-(5).

207.    15 U.S.C. §2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

208.    In connection with the purchase or lease of all Class Vehicles, and as detailed above, FCA provided Plaintiffs and Class members with a warranty covering defects in materials and workmanship of the Class Vehicles for three years or 36,000 miles (*i.e.*, the "BLW"), and a warranty covering the Class Vehicles' powertrain components for 5 years or 60,000 miles (*i.e.*, the "PLW"), both of which are covered under 15 U.S.C. §2301(6).

209.    FCA breached its warranties, as described in more detail above, and is therefore liable to Plaintiffs and Class members pursuant to 15 U.S.C. §2310(d)(1).  Without limitation, the Class Vehicles share a common design and/or manufacturing defect in that the Class Vehicles are defectively designed and built with a propensity to cause premature and excessive wear to the Engines' components, including the camshaft and lifter, and ultimately failure of those components and the Engines.  Through its practice of covering the cost of having the Class Vehicles Engines and/or components replaced when the Class Vehicle is still under warranty, FCA has tacitly admitted that the Class Vehicles suffer from a Defect of its own making, but FCA's inability to provides repairs that actually resolve the Defect and its refusal to acknowledge the

Defect in order to inform current and future purchasers and lessors of Class Vehicles is woefully insufficient.

210.    In its capacity as a warrantor, FCA had knowledge of the inherent defect in the Class Vehicles.  Any effort by FCA to limit any aspect of its warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

211.    Any limitations FCA might seek to impose on its warranties are procedurally unconscionable.  There was unequal bargaining power between FCA and Plaintiffs and Class members, as, at the time of purchase and lease, Plaintiffs and Class members had no other options for purchasing warranty coverage other than directly from FCA.

212.    Any limitations FCA might seek to impose on its warranties are substantively unconscionable.  FCA knew that the Class Vehicles were defective and would continue to pose infrastructure and quality concerns after the warranties purportedly expired.  FCA failed to disclose the Defect and the problems it causes to Plaintiffs and Class members.  Thus, FCA's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

213.    Defendant's breach of the implied warranty and express warranty deprived Plaintiff and Class Members of the benefits of their bargains.

214.    Because Plaintiffs and Class Members purchased their vehicles from an authorized FCA dealership, they are in privity with Defendant.  Plaintiffs and the members of the Class have had sufficient direct dealings with FCA and its agents (dealerships and customer support personnel) to establish privity of contract between FCA, on one hand, and Plaintiffs and the members of the Class, on the other hand.  Furthermore, FCA provided warranties directly to Plaintiffs and the members of the Class and Plaintiffs and the members of the Class are the intended

beneficiaries of FCA's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

215.    Nonetheless, privity is not required here because Plaintiffs and the members of the Class are the intended third-party beneficiaries of contracts between FCA and its dealerships. These contracts give the dealerships the right to sell FCA brand vehicles, as well as service and perform warranty repairs on FCA's behalf.  Plaintiffs and the members of the Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products FCA distributes to its authorized dealerships.  Plaintiffs and the members of the Class also have the right to receive service and warranty work at dealerships located more conveniently to them than FCA's headquarters.

216.    FCA breached these warranties, as described in more detail above. Without limitation, the Class Vehicles suffer from a Defect that puts vehicle occupants' safety in jeopardy. The Class Vehicles share a common defect in that they are defectively designed and/or manufactured with defective materials and/or with poor workmanship. Contrary to FCA's representations about its vehicles, the Class Vehicles are defective in manufacture, materials and/or workmanship and are unsafe. The Class Vehicles share a common defect.

217.    Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, FCA has long been on notice of the claims of Plaintiffs and Class members and has refused to provide a remedy, instead placing the blame on customers or refusing to acknowledge the existence of the defect.

218.    At the time of sale or lease of each Class Vehicle, FCA knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Class Vehicles' Defect and inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford FCA a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

219.    Pursuant to 15 U.S.C. §2310(e), Plaintiffs are entitled to bring this class action and are not required to give FCA notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Fed. R. Civ. P. 23. Notwithstanding the foregoing, Plaintiffs provided notice to FCA of their intent to pursue class claims under the MMWA via letters dated December 20, 2021, March 9, 2022, and March 11, 2022.

220.    Plaintiffs and Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them.  Because FCA is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and Class members have not reaccepted their Class Vehicles by retaining them.

221.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.  Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.  In addition, pursuant to 15 U.S.C. §2310(d)(2), Plaintiffs and Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual

time expended) determined by the Court to have reasonably been incurred by Plaintiffs and Class members in connection with the commencement and prosecution of this action.

222.     Plaintiffs seek the establishment of an FCA-funded program for Plaintiffs and Class members to recover out-of-pocket costs incurred in attempting to rectify the Defect in their Class Vehicles.

**B.     Claims on Behalf of the Illinois Sub-Class**

<u>**COUNT IV**</u>
**Violation of the Illinois Consumer Fraud And Deceptive Business Practices Act**
**815 ILCS 505/1, *et seq.***
**(On Behalf of the Illinois Sub-Class against Defendant)**

223.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 165 above as if fully set forth herein.

224.     Plaintiff Shawn Petro ("Illinois Plaintiff") brings this count on behalf of himself and the Illinois Sub-Class against Defendant.

225.     Illinois Plaintiff and the Illinois Sub-Class members are "consumers" as that term is defined in 815 ILCS 505/1(e).

226.     Defendant is a "person" as that term is defined in 815 ILCS 505/1(c).

227.     The purpose of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") is to enjoin trade practices which confuse or deceive the consumer. The Illinois CFA prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression, or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

FCA engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Illinois CFA.

228.     FCA participated in unfair or deceptive trade practices that violated the Illinois CFA.  As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, FCA knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. FCA systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

229.     FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

230.     FCA's unfair and deceptive acts or practices occurred repeatedly in FCA's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

231.     FCA knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

232.     FCA knew or should have known that its conduct violated the Illinois CFA.

233.     Defendant was under a duty to Illinois Plaintiff and the Illinois Sub-Class Members to disclose the defective nature of the Class Vehicles because:

(a)     Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

(b)     Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

(c)     Defendant actively concealed the defective nature of the Class Vehicles from Illinois Plaintiff and the Illinois Sub-Class Members at the time of sale and thereafter.

234.     By failing to disclose the Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

235.     The facts concealed or not disclosed by Defendant to Illinois Plaintiff and the Illinois Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's engine has a serious defect, which can cause the engine components to prematurely fail, resulting in decreased engine performance, loss of power, and eventual catastrophic engine failure is a material safety concern. Had Illinois Plaintiff and the Illinois Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

236.     Illinois Plaintiff and the Illinois Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

237.     Illinois Plaintiff provided notice of his claims and intention to represent a class of similarly situated consumers on December 20, 2021.

238.     As a result of Defendant's misconduct, Illinois Plaintiff and the Illinois Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

239.     As a direct and proximate result of Defendant's unfair or deceptive acts or practices,

240.     Illinois Plaintiff and the Illinois Sub-Class Members have suffered and will continue to suffer actual damages

241.     FCA's violations present a continuing risk to Illinois Plaintiff and the Illinois Sub-Class Members as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

242.     Pursuant to 815 ILCS 505/10a(a), Illinois Plaintiff and the Illinois Sub-Class Members seek monetary relief against FCA in the amount of actual damages, as well as punitive damages because FCA acted with fraud and/or malice and/or was grossly negligent.

243.     Illinois Plaintiff and the Illinois Sub-Class Members also seeks attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1, *et seq*.

### COUNT V
**Breach of Express Warranty**
**810 Ill. Comp. Stat. §§ 5/2-313 AND 5/2A-210**
**(On Behalf of the Illinois Sub-Class against Defendant)**

244.     Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 165 as if fully set forth herein.

245.     Plaintiff Shawn Petro ("Illinois Plaintiff") brings this count on behalf of himself and the Illinois Sub-Class against Defendant.

246.     FCA is and was at all relevant times a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

247.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

248.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

249.    The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

250.    The engines were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

251.    Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, FCA's express warranty is an express warranty under Illinois state law.

252.    FCA's basic limited warranty provides in relevant part that "[t]he Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation."

253.    According to FCA, the basic limited warranty lasts for 36 months or 36,0000 miles, whichever occurs first.

254.    The Warranty formed the basis of the bargain that was reached when Illinois Plaintiff and other members of the Illinois Sub-Class purchased or leased their Class Vehicles.

255.    FCA breached the express warranty through the acts and omissions described above.

256.    Further, Illinois Plaintiff and members of the Illinois Sub-Class experienced defects within the warranty period. Despite the existence of the warranties, Defendant failed to inform

Illinois Plaintiff and members of the Illinois Sub-Class that the Class Vehicles were equipped with defective engines, camshafts, lifters, and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

257.    FCA breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

258.    Because Illinois Plaintiff purchased his vehicle from an authorized FCA dealership, he is in privity with Defendant.  Illinois Plaintiff and the members of the Illinois Sub-Class have had sufficient direct dealings with FCA and its agents (dealerships and customer support personnel) to establish privity of contract between FCA, on one hand, and Illinois Plaintiff and the members of the Illinois Sub-Class, on the other hand.  Furthermore, FCA provided warranties directly to Illinois Plaintiff and the members of the Illinois Sub-Class and Illinois Plaintiff and the members of the Illinois Sub-Class are the intended beneficiaries of FCA's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

259.    Nonetheless, privity is not required here because Illinois Plaintiff and the members of the Illinois Sub-Class are the intended third-party beneficiaries of contracts between FCA and its dealerships.  These contracts give the dealerships the right to sell FCA brand vehicles, as well as service and perform warranty repairs on FCA's behalf.  Illinois Plaintiff and the members of the Illinois Sub-Class are the beneficiaries of these contracts, because they are the intended end-

consumers and users of the products FCA distributes to its authorized dealerships.  Illinois Plaintiff and the members of the Illinois Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than FCA's headquarters.

260.    Any attempt by FCA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because FCA knowingly sold or leased defective products without informing consumers about the Defect.  The time limits are unconscionable and inadequate to protect Illinois Plaintiff and the members of the Illinois Sub-Class.  Among other things, Illinois Plaintiff and members of the Illinois Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by FCA and unreasonable favored FCA. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between FCA and members of the Class.

261.    Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Illinois Plaintiff and the members of the Illinois Sub-Class whole, because FCA has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

262.    Illinois Plaintiff was not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of written warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

263.     Nonetheless, Illinois Plaintiff provided notice to FCA of the breach of express warranties when he repeatedly took his vehicle to an authorized FCA dealership and requested warranty repairs.  Illinois Plaintiff also provided notice by letter dated December 20, 2021.

264.     As a result of FCA's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Illinois Plaintiff and Illinois Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

265.     As a result of FCA's breach of the express warranty, Illinois Plaintiff and Illinois Sub-Class Members are entitled to legal and equitable relief against FCA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

**<u>COUNT VI</u>**
**Breach of the Implied Warranty of Merchantability**
**810 Ill. Comp. Stat. §§ 5/2-314 AND 5/2A-212**
**(On Behalf of the Illinois Sub-Class against Defendant)**

266.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 165 as if fully set forth herein.

267.     Plaintiff Shawn Petro ("Illinois Plaintiff") brings this count on behalf of himself and the Illinois Sub-Class against Defendant.

268.     FCA is and was at all relevant times a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

269.     With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

270.    The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

271.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under 810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212.

272.    FCA knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. FCA directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Illinois Plaintiff and members of the Illinois Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. FCA knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Illinois Plaintiff and members of the Illinois Sub-Class, with no modification to the defective Class Vehicles.

273.    FCA provided Illinois Plaintiff and members of the Illinois Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

274.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by FCA were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

275.    Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Illinois Plaintiff and Illinois Sub-Class Members with reliable, durable, and safe transportation. Instead, the Class

Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. FCA knew of this defect at the time these sale or lease transactions occurred.

276.    As a result of FCA's breach of the applicable implied warranties, Illinois Plaintiff and members of the Illinois Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Illinois Plaintiff and members of the Illinois Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

277.    FCA's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

278.    Because Illinois Plaintiff purchased his vehicle from an authorized FCA dealership, he is in privity with Defendant.  Illinois Plaintiff and the members of the Illinois Sub-Class have had sufficient direct dealings with FCA and its agents (dealerships and customer support personnel) to establish privity of contract between FCA, on one hand, and Illinois Plaintiff and the members of the Illinois Sub-Class, on the other hand.  Furthermore, FCA provided warranties directly to Illinois Plaintiff and the members of the Illinois Sub-Class and Illinois Plaintiff and the members of the Illinois Sub-Class are the intended beneficiaries of FCA's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

279.    Nonetheless, privity is not required here because Illinois Plaintiff and the members of the Illinois Sub-Class are the intended third-party beneficiaries of contracts between FCA and its dealerships.  These contracts give the dealerships the right to sell FCA brand vehicles, as well

as service and perform warranty repairs on FCA's behalf.  Illinois Plaintiff and the members of the Illinois Sub-Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products FCA distributes to its authorized dealerships.  Illinois Plaintiff and the members of the Illinois Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than FCA's headquarters.

280.    Illinois Plaintiff and members of the Illinois Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of FCA's conduct described herein.

281.    Illinois Plaintiff and members of the Illinois Sub-Class were not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received from Illinois Plaintiff and the Class Members and through other internal sources.

282.    Nonetheless, Plaintiffs provided notice to FCA of the breach of implied warranties when they repeatedly took their vehicles to an authorized FCA dealership and requested warranty repairs.  Illinois Plaintiff also provided notice by letter dated December 20, 2021.

283.    As a direct and proximate cause of FCA's breach, Illinois Plaintiff and members of the Illinois Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Illinois Plaintiff and members of the Illinois Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

284.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Illinois Plaintiff and members of the Illinois Sub-Class have been damaged in an amount to be proven at trial.

**C.     Claims on Behalf of the Louisiana Sub-Class**

**COUNT VII**
**Breach of Warranty against Redhibitory Defects,**
**La. Civ. Code Ann. Art. 2520, 2524**
**(On Behalf of the Illinois Sub-Class against Defendant)**

285.    Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 165 as if fully set forth herein.

286.    Plaintiff David Kinchen ("Louisiana Plaintiff") brings this count on behalf of himself and the Louisiana Sub-Class against Defendant.

287.    FCA is and was at all times relevant "sellers" with respect to motor vehicles under La. Civ. Code Ann. art. 2520, 2524.

288.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to La. Civ. Code Ann. art 2520, 2524.

289.    The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose of providing reliable, durable, and safe transportation. The Class Vehicles contain an inherent Defect at the time of sale or lease and thereafter and present an undisclosed safety risk to drivers, passengers, and other motorists.  The Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. FCA knew of this defect at the time these sale or lease transactions occurred. Thus, Defendant breached the implied warranty of merchantability.

290.    At the time the members of the Louisiana Sub-Class acquired their Class Vehicles, those vehicles had a redhibitory defect within the meaning of La. Civ. Code Ann. art. 2520, in that (a) the Class Vehicles were rendered so inconvenient that members of the Louisiana Sub-Class either would not have purchased the Class Vehicles had they known of the Defect, or (b) because the Defect so diminished the usefulness and/or value of the Class Vehicles such that it must be presumed that Class members would have purchased the Class Vehicles, but for a lesser price.

291.    FCA was provided notice of the Defect by pre-production testing, design failure mode analysis, calls to its customer service hotline, aggregate part sales, dealer audit, aggregate warranty information, complaints made to the National Highway Transportation Safety Administration ("NHTSA")—which FCA monitors—and customer complaint made to both FCA and its authorized dealers regarding both prior model years which the same Engines and about the Engines in Class Vehicles.  Affording FCA a reasonable opportunity to cure its breach of implied warranties would be unnecessary and futile here because FCA have known of and concealed the Defect and, as discovery will show, have refused to repair or replacement the defective engines and/or Class Vehicles free of charge within a reasonable time.

292.    FCA was further provided notice by Louisiana Plaintiff of its breach of warranties by letter dated March 11, 2022.  Despite this notice, FCA did not fully cure the breach of warranties and failed to provide a suitable repair or replacement of her destroyed Class Vehicle free of charge within a reasonable time.

293.    FCA cannot disclaim its implied warranties as it knowingly sold or leased a defective product.

294.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Louisiana Plaintiff and members of the Louisiana Sub-Class have been damaged in amount to be proven at trial.

295.    Louisiana Plaintiff and members of the Louisiana Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of FCA's conduct described herein.

296.    The Class Vehicles are not safe and reliable and owners and lessees of these vehicles have lost confidence in the ability of Class Vehicles to perform the function of safe reliable transportation, given the Defect as alleged above, which can cause the engine components to prematurely fail, resulting in decreased engine performance, loss of power, and eventual catastrophic engine failure. Defendant is estopped by its conduct, as alleged herein, from disclaiming any and all implied warranties with respect to the defective engines in Class Vehicles.

297.    The Defect in the Class Vehicles renders their use so inconvenient that Louisiana Plaintiff and members of the Louisiana Sub-Class would not have purchased or leased the Class Vehicle had they known of the Defect.  Accordingly, Louisiana Plaintiff and the Louisiana Sub-Class are entitled to obtain a recission of the sale of their Class Vehicles.

298.    Alternatively, the Defect diminishes the usefulness of the Class Vehicles or their value so that Louisiana Plaintiff and members of the Louisiana Sub-Class would still have bought their Class Vehicles but for a lesser price.  Accordingly, Louisiana Plaintiff and the Louisiana Sub-Class are entitled to obtain a reduction of the price.

299.    The applicable period of prescription for the implied warranty claim has been tolled by the discovery rule and FCA's fraudulent concealment of the Defect, as well as the terms of the express warranty.

300.     Pursuant to La. Civ. Code Ann. arts. 2531 and 2545, Louisiana Plaintiff and the Louisiana Sub-Class seek to recover the purchase price with interest from the time the Vehicles were priced; or else the difference in value of the defective Class Vehicles at the time of sale compared to their value warranted by Defendant; reasonable expenses occasioned by the sales; reasonable attorneys' fees; and any other just and proper relief available.

### COUNT VIII
**Violation of the Louisiana Product Liability Act,**
**La. Stat. Ann. 9:2800.51, *et seq.***
(On Behalf of the Louisiana Sub-Class against Defendant)

301.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 165 above as if fully set forth herein.

302.     Louisiana Plaintiff brings this count on behalf of himself and the Louisiana Sub-Class against Defendant.

303.     FCA is a "manufacturer" within the meaning of La. Stat. Ann. 9:2800.53(1).

304.     Louisiana Plaintiff and the Louisiana Sub-Class are "claimants" within the meaning of La. Stat. Ann. 9:2800.53(4).

305.     FCA placed the Class Vehicles into trade or commerce, which are "products" within the meaning of La. Stat. Ann. 9:2800.53(3).

306.     The Louisiana Products Liability Act ("LPLA") makes manufacturers liable for the damages caused by their products which are "unreasonably dangerous" like one of four ways: (1) in construction or composition; (2) design; (3) inadequate warning; and (4) nonconformity to express warranty. LA. STAT. ANN. 9:2800.55-58.

307.     FCA manufactured, sold, and distributed the Class Vehicles, including the engines and their defects, which render the Class Vehicles unreasonably dangerous with an associated safety risk which can the engine components to prematurely fail, resulting in decreased engine

performance, loss of power, and eventual catastrophic engine failure.  Louisiana Plaintiff and the Louisiana Sub-Class used the Class Vehicles in a reasonably foreseeable manner by using the vehicles to transport themselves and others.

308.    The engines installed within the Class Vehicles are unreasonably dangerous in construction or composition because the Defect causes excessive and premature wear of the camshaft and lifters, which leads to premature failure of these components and does not meet performance standards for engines in any vehicle and deviates in a material from the manufacturer's specifications.  Furthermore, the Defect and its associated safety risk put drivers, passengers, and other motorists at risk for injury due to sudden engine failure or shutoff while the vehicle is in motion.  The performance standards for engines do not include the risk that they will fail or shutoff while being driven and Defendant's specifications for the Class Vehicles do not include such a risk.

309.    The Class Vehicles are unreasonably dangerous due to the Defect and FCA's failure to disclose the Defect, their existence, and associated safety risk to Louisiana Plaintiff and the Louisiana Sub-Class. At the time Louisiana Plaintiff and the Louisiana Sub-Class purchased their Class Vehicles, FCA knew, or should have known, that the Defect in the Class Vehicles would cause the engine to consume excessive oil, stall, lose power, and experience fires while being driven.  Further, Defendant knew, or should have known, that this associated safety risk would cause the Class Vehicles to become involved in accidents and/or be engulfed in flames, putting drivers, passengers, and other motorists at risk for injury.  However, FCA provided no warnings or otherwise conveyed these risks to Louisiana Plaintiff and the Louisiana Sub-Class.

310.    The Class Vehicles are also unreasonably dangerous because the existence of the Defect and its associated safety risk, and FCA's failure to disclose either violates the express

warranty FCA provided that the Class Vehicles were safe, reliable, and functional vehicles capable of providing transportation, and that FCA's industry-best warranty would correct any known defects in the Class Vehicles' manufacture, materials, and/or workmanship. Such warranties induced Louisiana Plaintiff and members of the Louisiana Sub-Class to purchase the Class Vehicles. These representations were untrue at the time of the purchase and/or lease of the Class Vehicles because FCA knew that the Class Vehicles contained the Defect and associated safety risk. FCA's failure to provide Class Vehicles that conformed with their representations lead to the injuries sustained by Louisiana Plaintiff and the Louisiana Sub-Class.

311.    FCA knowingly concealed, suppressed and/or omitted the existence of the Defect and its associated safety risk in the Class Vehicles at the time of their sale or lease and at all relevant times thereafter. FCA failed to inform Louisiana Plaintiff and the members of the Louisiana Sub-Class of the Defect in their Class Vehicles at the time of purchase or lease and all times thereafter and Louisiana Plaintiff and the members of the Louisiana Sub-Class had no independent knowledge that the Class Vehicles incorporate the Defect.

312.    Had disclosed that the Class Vehicles had the Defect and associated safety risk, Louisiana Plaintiff and the members of the Louisiana Sub-Class would not have purchased or leased the Class Vehicles or would have paid less for their vehicles.

313.    As a proximate and direct result of FCA's conduct as described herein, Louisiana Plaintiff and members of the Louisiana Sub-Class have suffered and continue to suffer harm by the loss of their vehicles, the threat of engine failure, and/or higher than expected maintenance costs based on FCA's own estimates, actual costs and damages including costs of repair and expenses for obtaining alternative transportation, and other damages to be determined at trial. Louisiana Plaintiff and members of the Louisiana Sub-Class have also suffered the ascertainable

loss of the benefit of the bargain they reached at the time of purchase or lease, and diminished value of their Class Vehicles.

314.    The conduct of FCA caused unavoidable and substantial injury to Class Vehicle owners and lessees (who were unable to have reasonably avoided injury due to no fault of their own and Defendant's concealment of the Defect) without any countervailing benefit to consumers.

315.    The applicable period of prescription of the LPLA has been tolled by the discovery rule, fraudulent concealment, and the terms of the express warranty.

316.    Pursuant to La. Civ. Ann. art. 2315, Louisiana Plaintiff and the Louisiana Sub-Class seek to recover compensatory damages for past and future harms in an amount to be determined at trial, and any other just and proper relief available.

**D.    Claims Brought on Behalf of the Oklahoma Class**

<u>**COUNT IX**</u>
**Violation of the Oklahoma Consumer Protection Act**
**OKLA. STAT. TIT. 15, § 751 *et seq.***
**(On Behalf of the Oklahoma Sub-Class against Defendant)**

317.    Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 165 as if fully set forth herein.

318.    Plaintiff Mike Fairchild ("Oklahoma Plaintiff") brings this claim on behalf of himself and the Oklahoma Class.

319.    Oklahoma Plaintiffs and the Oklahoma Sub-Class Members are "persons" within the meaning of the Oklahoma Consumer Protection Act ("Oklahoma CPA"), Okla. Stat. tit. 15, § 752.

320.    Defendant is a "person," "corporation," or "association" within the meaning of Okla. Stat. tit. 15 § 15-751(1).

321.    The sale or lease of the Class Vehicles to Oklahoma Plaintiffs and the Oklahoma Sub-Class members was a "consumer transaction" within the meaning of Okla. Stat. tit. 15, § 752, and FCA's actions as set forth herein occurred in the conduct of trade or commerce.

322.    The Oklahoma CPA declares unlawful, inter alia, the following acts or practices when committed in the course of business: (1) "mak[ing] a false or misleading representation, knowingly or with reason to know, as to the characteristics, . . . uses, [or] benefits, of the subject of a consumer transaction;" (2) making a false representation, "knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another;" (3) "[a]dvertis[ing], knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it as advertised;" and (4) otherwise committing "an unfair or deceptive trade practice." Okla. Stat. tit. 15, § 753. FCA engaged in misleading, false, or deceptive acts that violated the Oklahoma CPA.

323.    FCA participated in unfair or deceptive trade practices that violated the Oklahoma CPA.  As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, FCA knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. FCA systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

324.    FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any

material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

325.    FCA's unfair and deceptive acts or practices occurred repeatedly in FCA's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

326.    FCA knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

327.    FCA knew or should have known that its conduct violated the Oklahoma CPA.

328.    Defendant was under a duty to Oklahoma Plaintiff and the Oklahoma Sub-Class Members to disclose the defective nature of the Class Vehicles because:

(a)    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

(b)    Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

(c)    Defendant actively concealed the defective nature of the Class Vehicles from Oklahoma Plaintiff and the Oklahoma Sub-Class Members at the time of sale and thereafter.

329.    By failing to disclose the Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

330.    The facts concealed or not disclosed by Defendant to Oklahoma Plaintiff and the Oklahoma Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's engine has a serious defect, which can cause the engine components to prematurely fail, resulting in decreased engine performance, loss of power, and

eventual catastrophic engine failure is a material safety concern. Had Oklahoma Plaintiff and the Oklahoma Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

331.   Oklahoma Plaintiff and the Oklahoma Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

332.   Oklahoma Plaintiff provided notice of his claims and intention to represent a class of similarly situated consumers on March 9, 2022.

333.   As a result of Defendant's misconduct, Oklahoma Plaintiff and the Oklahoma Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

334.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices,

335.   Oklahoma Plaintiff and the Oklahoma Sub-Class Members have suffered and will continue to suffer actual damages

336.   FCA's violations present a continuing risk to Oklahoma Plaintiff and the Oklahoma Sub-Class Members as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

337.   Pursuant to Okla. Stat. tit. 15, § 761.1, Oklahoma Plaintiff and the Oklahoma Sub-Class Members seek monetary relief against FCA in the amount of actual damages, discretionary penalties up to $2,000 per violation, punitive damages, and reasonable attorneys' fees because FCA's unconscionable conduct caused injury to Oklahoma Plaintiffs and the Oklahoma Sub-Class Members.

## COUNT X
### Breach of Express Warranty
### OKLA. STAT. TIT. 12A, §§ 2-313 and 2A-210
### (On Behalf of the Oklahoma Sub-Class against Defendant)

338.    Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 165 as if fully set forth herein.

339.    Plaintiff Mike Fairchild ("Oklahoma Plaintiff") brings this claim on behalf of himself and the Oklahoma Class.

340.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Okla. Stat. tit. 12A §§ 2-104(1) and 2-1103(3), and a "seller" of motor vehicles under § 2A-103(1)(t).

341.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Okla. Stat. tit. 12A § 2A-103(1)(p).

342.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Okla. Stat. tit. 12A §§ 2-105(1) and 2A-103(1)(h).

343.    The engines were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

344.    Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, FCA's express warranty is an express warranty under Oklahoma state law.

345.    FCA's basic limited warranty provides in relevant part that "[t]he Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation."

346.    According to FCA, the basic limited warranty lasts for 36 months or 36,0000 miles, whichever occurs first.

347.    The Warranty formed the basis of the bargain that was reached when Oklahoma Plaintiff and other members of the Oklahoma Sub-Class purchased or leased their Class Vehicles.

348.    FCA breached the express warranty through the acts and omissions described above.

349.    Further, Oklahoma Plaintiff and members of the Oklahoma Sub-Class experienced defects within the warranty period. Despite the existence of the warranties, Defendant failed to inform Oklahoma Plaintiff and members of the Oklahoma Sub-Class that the Class Vehicles were equipped with defective engines, camshafts, lifters, and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

350.    FCA breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

351.    Because Oklahoma Plaintiff purchased his vehicle from an authorized FCA dealership, he is in privity with Defendant.  Oklahoma Plaintiff and the members of the Oklahoma Sub-Class have had sufficient direct dealings with FCA and its agents (dealerships and customer support personnel) to establish privity of contract between FCA, on one hand, and Oklahoma Plaintiff and the members of the Oklahoma Sub-Class, on the other hand.  Furthermore, FCA provided warranties directly to Oklahoma Plaintiff and the members of the Oklahoma Sub-Class and Oklahoma Plaintiff and the members of the Oklahoma Sub-Class are the intended beneficiaries of FCA's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with

provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

352.    Nonetheless, privity is not required here because Oklahoma Plaintiff and the members of the Oklahoma Sub-Class are the intended third-party beneficiaries of contracts between FCA and its dealerships. These contracts give the dealerships the right to sell FCA brand vehicles, as well as service and perform warranty repairs on FCA's behalf. Oklahoma Plaintiff and the members of the Oklahoma Sub-Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products FCA distributes to its authorized dealerships. Oklahoma Plaintiff and the members of the Oklahoma Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than FCA's headquarters.

353.    Any attempt by FCA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because FCA knowingly sold or leased defective products without informing consumers about the Defect. The time limits are unconscionable and inadequate to protect Oklahoma Plaintiff and the members of the Oklahoma Sub-Class. Among other things, Oklahoma Plaintiff and members of the Oklahoma Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by FCA and unreasonable favored FCA. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between FCA and members of the Class.

354.    Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to

make Oklahoma Plaintiff and the members of the Oklahoma Sub-Class whole, because FCA has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

355.    Oklahoma Plaintiff were not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of written warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

356.    Nonetheless, Oklahoma Plaintiff provided notice to FCA of the breach of express warranties when he repeatedly took his vehicle to an authorized FCA dealership and requested warranty repairs.  Oklahoma Plaintiff also provided notice by letter dated March 9, 2022.

357.    As a result of FCA's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Oklahoma Plaintiff and Oklahoma Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

358.    As a result of FCA's breach of the express warranty, Oklahoma Plaintiff and Oklahoma Sub-Class Members are entitled to legal and equitable relief against FCA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

### COUNT XI
**Breach of Implied Warranty**
**OKLA. STAT. TIT. 12A, §§ 2-314 and 2A-212**
**(On Behalf of the Oklahoma Sub-Class against Defendant)**

359.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 165 as if fully set forth herein.

360.    Plaintiff Mike Fairchild ("Oklahoma Plaintiff") brings this claim on behalf of himself and the Oklahoma Class.

361.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Okla. Stat. tit. 12A §§ 2-104(1) and 2-1103(3), and a "seller" of motor vehicles under § 2A-103(1)(t).

362.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Okla. Stat. tit. 12A § 2A-103(1)(p).

363.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Okla. Stat. tit. 12A §§ 2-105(1) and 2A-103(1)(h).

364.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Okla. Stat. tit. 12A §§ 2-314 and 2A-212.

365.    FCA knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. FCA directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Oklahoma Plaintiff and members of the Oklahoma Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. FCA knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Oklahoma Plaintiff and members of the Oklahoma Sub-Class, with no modification to the defective Class Vehicles.

366.    FCA provided Oklahoma Plaintiff and members of the Oklahoma Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

367.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by FCA were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

368.    Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Oklahoma Plaintiff and Oklahoma Sub-Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. FCA knew of this defect at the time these sale or lease transactions occurred.

369.    As a result of FCA's breach of the applicable implied warranties, Oklahoma Plaintiff and members of the Oklahoma Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Oklahoma Plaintiff and members of the Oklahoma Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

370.    FCA's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

371.    Because Oklahoma Plaintiff purchased his vehicle from an authorized FCA dealership, he is in privity with Defendant.  Oklahoma Plaintiff and the members of the Oklahoma Sub-Class have had sufficient direct dealings with FCA and its agents (dealerships and customer support personnel) to establish privity of contract between FCA, on one hand, and Oklahoma Plaintiff and the members of the Oklahoma Sub-Class, on the other hand.  Furthermore, FCA provided warranties directly to Oklahoma Plaintiff and the members of the Oklahoma Sub-Class

and Oklahoma Plaintiff and the members of the Oklahoma Sub-Class are the intended beneficiaries of FCA's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

372.   Nonetheless, privity is not required here because Oklahoma Plaintiff and the members of the Oklahoma Sub-Class are the intended third-party beneficiaries of contracts between FCA and its dealerships. These contracts give the dealerships the right to sell FCA brand vehicles, as well as service and perform warranty repairs on FCA's behalf. Oklahoma Plaintiff and the members of the Oklahoma Sub-Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products FCA distributes to its authorized dealerships. Oklahoma Plaintiff and the members of the Oklahoma Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than FCA's headquarters.

373.   Oklahoma Plaintiff and members of the Oklahoma Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of FCA's conduct described herein.

374.   Oklahoma Plaintiff and members of the Oklahoma Sub-Class were not required to notify FCA of the breach because affording FCA a reasonable opportunity to cure its breach of warranty would have been futile. FCA was also on notice of the Defect from the complaints and service requests it received from Oklahoma Plaintiff and the Class Members and through other internal sources.

375.     Nonetheless, Plaintiffs provided notice to FCA of the breach of implied warranties when they repeatedly took their vehicles to an authorized FCA dealership and requested warranty repairs.  Oklahoma Plaintiff also provided notice by letter dated March 9, 2022.

376.     As a direct and proximate cause of FCA's breach, Oklahoma Plaintiff and members of the Oklahoma Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Oklahoma Plaintiff and members of the Oklahoma Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

377.     As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Oklahoma Plaintiff and members of the Oklahoma Sub-Class have been damaged in an amount to be proven at trial.

## IX.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the members of the Nationwide and State Classes, respectfully request that the Court certify the proposed Nationwide and State Classes, including designating the named Plaintiffs as representatives of the Nationwide Class and their respective State Classes and appointing the undersigned as Class Counsel, and the designation of any appropriate issue classes, under the applicable provisions of Fed. R. Civ. P. 23, and that the Court enter judgment in Plaintiffs' favor and against FCA, including the following relief:

(a)     A declaration that any applicable statutes of limitations are tolled due to FCA's fraudulent concealment failure to disclose and that FCA is estopped from relying on any statutes of limitations in defense;

(b)      Restitution, compensatory damages, and costs for economic loss and out-of-pocket costs;

(c)      Punitive and exemplary damages under applicable law;

(d)      Reimbursement and compensation of the full purchase price for any repairs or replacements purchased by a Plaintiff or Class member to remedy the Defect;

(e)      A determination that FCA is financially responsible for all Class notices and the administration of Class relief;

(f)      Any applicable statutory or civil penalties;

(g)      An order requiring FCA to pay both pre-judgment and post-judgment interest on any amounts awarded;

(h)      An award of reasonable counsel fees, plus reimbursement of reasonable costs, expenses, and disbursements, including reasonable allowances for the fees of experts;

(i)      Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

(j)      Any such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs and Class members hereby demand a trial by jury, pursuant to Fed. R. Civ. P. 38(b), of all issues so triable.

Respectfully submitted,


Dated: May 10, 2022

/s/Russell D. Paul
Russell D. Paul (DE Bar 4647)
Abigail J. Gertner (*pro hac vice* forthcoming)
Natalie Lesser (*pro hac vice* forthcoming)
Amey J. Park (*pro hac vice* forthcoming)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600

Philadelphia, PA 19103
Telephone:     (215) 875-3000
Fax:     (215) 875-4604
rpaul@bm.net
agertner@bm.net
nlesser@bm.net
apark@bm.net

Tarek H. Zohdy (*pro hac vice* forthcoming)
Cody R. Padgett (*pro hac vice* forthcoming)
Laura E. Goolsby (*pro hac vice* forthcoming)
**CAPSTONE LAW APC**
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Tel.:     (310) 556-4811
Fax:     (310) 943-0396
Tarek.Zohdy@capstonelawyers.com
Cody.Padgett@capstonelawyers.com
Laura.Goolsby@capstonelawyers.com

Jason H. Alperstein (*pro hac vice* forthcoming)
Jeff Ostrow (*pro hac vice* forthcoming)
Kristen Lake Cardoso (*pro hac vice* forthcoming)
**KOPELOWITZ OSTROW**
**FERGUSON WEISELBERG GILBERT**
One West Las Olas, Suite 500
Fort Lauderdale, FL 33301
Tel.:     (954) 525-4100
Fax:     (954) 525-4300

Steven G. Calamusa (*pro hac vice* forthcoming)
Geoff S. Stahl (*pro hac vice* forthcoming)
Rachel A. Bentley (*pro hac vice* forthcoming)
**GORDON & PARTNERS, P.A.**
4114 Northlake Blvd.
Palm Beach Gardens, FL 33410
Tel:     (561) 799-5070
Fax:     (561) 799-4050
SCalamusa@fortheinjured.com
GStahl@fortheinjured.com
RBentley@fortheinjured.com

*Attorneys for Plaintiffs and the Proposed Classes*